[No. A056656. First Dist., Div. Two. Jan. 17, 1995.]

CHARLES WAYNE SPARKS et al., Plaintiffs and Respondents, v.
OWENS-ILLINOIS, INC., Defendant and Appellant.

464

COUNSEL

Brobeck, Phleger & Harrison, Thomas M. Peterson, Morgenstein & Jubelirer, Eliot S. Jubelirer and Larry C. Lowe for Defendant and Appellant.

Bryce C. Anderson, Harrison & DeGarmo, Joseph M. Visse and Jeffrey B. Harrison for Plaintiffs and Respondents.

OPINION

PHELAN, J.—Owens-Illinois, Inc. (Owens-Illinois or appellant), timely appeals from a judgment entered after a jury trial, by which it was held 100 percent responsible for personal injuries to Charles Wayne Sparks (Sparks) and his wife, Betty Raley Sparks, respondents herein.[1] The jury found that an Owens-Illinois product, an asbestos-containing thermal insulation known as Kaylo, was defective, and that the defect was the sole legal cause of injury to Sparks. Appellant contends that: (1) There was no evidence that Kaylo was defective because plaintiffs failed to show that it could have been designed more safely, i.e., without asbestos as a component; (2) There is no substantial evidence to support the jury's decision to allocate 100 percent of the fault to Owens-Illinois, as opposed to other manufacturers of asbestos-containing products to which Sparks was or may have been exposed; and (3) It is entitled to a new trial to determine whether Sparks's employer, the United States Navy, must bear responsibility for a portion of his non-economic damages pursuant to Civil Code section 1431.1 et seq. (hereafter Proposition 51), as that provision has been interpreted by the California Supreme Court in a recent decision, *DaFonte* v. *Up-Right, Inc.* (1992) 2 Cal.4th 593 [7 Cal.Rptr.2d 238, 828 P.2d 140].

We conclude that substantial evidence supports the jury verdict in this case, and that Owens-Illinois failed to preserve the issue whether the Navy should be held responsible for a portion of Sparks's noneconomic damages. Accordingly, we affirm the judgment in its entirety.

I. FACTUAL AND PROCEDURAL BACKGROUND

Appellant Owens-Illinois made and sold a product known as "Kaylo" between 1948 and 1958. Kaylo was a calcium silicate insulation, made with 13 to 20 percent asbestos, which was sold in pipe-covering and block forms, and intended to be used for "industrial high[-]temperature thermal insulation." The asbestos used in Kaylo was predominantly of the chrysotile

---

[1]Mrs. Sparks is acting as respondent in this appeal both on her own behalf, and as executor of Mr. Sparks's estate.

variety but amosite was also used to a lesser extent. Owens-Illinois never made asbestos-containing products other than Kaylo pipe covering and block. Owens-Illinois sold its Kaylo operation to Owens-Corning Fiberglass in April 1958. Owens-Corning Fiberglass continued to make and sell Kaylo pipe covering and block insulation after April 1958. The Kaylo products were made for Owens-Corning Fiberglass by Fibreboard Corp. from 1960 to 1972.

## A. *Charles Sparks's Service Aboard the U.S.S. Bremerton.*

Charles Sparks joined the United States Navy in 1959, when he was 20 years old. Although he originally intended to obtain training as a draftsman, he was instead sent for training as a metalsmith. Also in 1959, Sparks met and married his wife, Betty. Shortly after he was married, Sparks was sent out on a six-month cruise aboard the heavy cruiser U.S.S. Bremerton.

The Bremerton operated on steam turbines and, therefore, had many pipes, valves, condensers, heat exchangers, generators, boilers, and other machinery which had to be insulated against high temperatures. There was no significant work on the insulation during the cruise but, in January or February of 1960, the Bremerton was sent to Long Beach for a decommissioning overhaul, which lasted approximately six months. Sparks's duty aboard the Bremerton during the decommissioning was to remove and inspect the valves in the various pipelines. In order for Sparks to do this, the insulation had to be sawed or cut, and removed from the pipes. A great deal of dust was generated by the procedures Sparks followed to remove the insulation and the valves. At the same time, the boilers and other machinery were being overhauled by procedures that also generated dust to which Sparks was exposed. Regular cleanup procedures during the decommissioning involved the use of compressed air and fox-tail brooms, both of which generated a large amount of dust.

## B. *The Prior Overhaul of the U.S.S. Bremerton in Puget Sound.*

Lowell Erwin was an insulator at Puget Sound from 1955 to 1959, and a journeyman mechanic from 1959 to 1974. He gave extensive testimony about the installation and removal of both block insulation and pipe covering on Navy ships. In particular, he testified that a standard way for removing calcium silicate pipe insulation such as Kaylo was to cut the cloth covering with a linoleum knife, and then to saw through the insulation down to the underlying pipe. This procedure generated "sawdust" consisting of the insulation material.

One of the ships on which Erwin worked was the Bremerton. At the time he worked on the Bremerton, which he remembers as sometime around the

middle of 1957, all the old asbestos insulation in the machinery areas had been removed and new insulation was being installed. Erwin further testified that the boiler of a ship such as the Bremerton was insulated with large amounts of Kaylo block. The high-temperature piping coming out of the boilers was insulated with calcium silicate sectionals, and Erwin used Kaylo when it was available. High-temperature valves were also insulated with calcium silicate, preferably Kaylo. Low-temperature piping was insulated with 85 percent magnesium insulation ("85% mag") or felt insulation. Some of the "85% mag" insulation was manufactured by Johns-Manville, but some may have been made by Carey and Pabco.

Erwin identified a picture of a package of Owens-Illinois's Kaylo as the product used at Puget Sound, and testified that it was the insulation he preferred to use and would search to find before using other substitute products. He said that Kaylo was installed on low-temperature steam lines and hot water systems although, for the low-temperature situations, "85% mag" insulation was cheaper than Kaylo. The "85% mag" insulation was also used for hull work, which was outside the machinery area and involved mostly low-temperature applications. Erwin testified that he used Kaylo on the high-pressure steam lines and more than likely on the fire pumps and minor turbines. All of Erwin's work on the Bremerton was on the steam systems, and approximately 75 percent was on the pipelines. None was on hull work.

Plaintiffs also presented the deposition testimony of another insulator who worked at the Puget Sound Shipyard. That witness, Ralph David, testified that he had no idea that his workplace exposure to asbestos could be dangerous to his health. Mr. David further stated that both he and the other workers who ripped out and installed asbestos-containing insulation simply assumed that it was part of their job and that there was no particular danger in it.

### C. *Charles Sparks's Later Asbestos Exposure.*

Sparks was undisputedly exposed to asbestos on two occasions after his tour of duty on the Bremerton. He was a sheet metal worker aboard the U.S.S. Frontier, a destroyer tender, for 18 months. Then, from 1966 to 1974, he worked as a sheet metal worker as a civilian employee in the Long Beach Naval Shipyard. Sparks did not work with asbestos during this time period but the pipefitters across the alley did and, occasionally, dust from their work area would blow into the shop where Sparks worked. During his first year at the Long Beach Naval Shipyard, he worked as a sheetmetal fabricator and was occasionally exposed to the pipefitters' dust. Thereafter, however,

he drew and cut paper patterns for sheet metal at a large workbench, which was located in an enclosed air-conditioned space that was not infiltrated by the white dust from the shop across the alley. Sparks also parked his car next to the pipefitting shop and, during the summer, he left the windows open a crack for ventilation. A small amount of asbestos dust would, thus, occasionally blow into his car.

### D. *Expert Testimony Regarding Asbestos Exposure.*

Several medical experts testified on behalf of the Sparkses.[2] Dr. Barry Horn testified that asbestos-related cancers are dose dependent—that is, the risk of contracting the disease increases with the amount of exposure to asbestos dust. He also testified that both the intensity of the dosage and the length of time of exposure are important to the risk assessment. However, all asbestos-exposures are not equally risky; exposure to amosite asbestos is three times as likely to cause mesothelioma as exposure to the same amount of chrysotile asbestos. Although he discussed the *risk* of mesothelioma in terms of Sparks's cumulative exposure to asbestos, Dr. Horn also testified that the exposure which Charles Sparks experienced on the Bremerton was the most intense of his lifetime and was "certainly" sufficient, "in and of itself," to have caused his mesothelioma.

Dr. Samuel Hammar, a pathologist, also testified that the exposure Sparks incurred on the Bremerton was "easily great enough" to have caused his mesothelioma. More specifically, Dr. Hammar opined that exposure to *Kaylo* fibers during the decommissioning of the Bremerton was, by itself, sufficient to cause his disease.

Douglas Fowler, an industrial hygienist at the University of California in Berkeley, testified about various asbestos products, including the calcium silicate product known as Kaylo. He also gave a rough estimate that a single saw cut across a Kaylo-covered pipe during removal could potentially release trillions of asbestos fibers. This removal process and the dust it generated were easily foreseeable because overhauls necessitating removal of pipe insulation are routine for Navy ships. In particular, removal involved ripping out the old insulation and sweeping up debris, all of which generated dust. Fowler further testified that if Kaylo was installed on the Bremerton in 1957, it was almost certainly removed in 1959 or 1960, because the Navy ships operated on a two- to three-year overhaul cycle. Fowler also testified

---

[2]Appellant, on the other hand, relied exclusively on cross-examination of plaintiffs' medical experts rather than presenting any of its own.

that Sparks's exposure to asbestos on the Bremerton was the most intense of his lifetime.[3]

Dr. Allan Smith, a professor of epidemiology at the University of California, testified that the only established cause of mesothelioma in humans was asbestos exposure, and that the highest exposure levels recorded on board ships were in cleanup work. He also testified that the peak occurrence of mesothelioma diagnosis is between 30 and 40 years after the first exposure to asbestos fibers. Finally, he testified that the asbestos exposure that Sparks experienced aboard the Bremerton in 1960 during the decommissioning was the highest intensity asbestos exposure of his working life and that this exposure, by itself, was sufficient to have caused his mesothelioma.

Finally, Samuel Schillaci, the Owens-Illinois employee who was responsible for overseeing the Kaylo division in the 1950's, testified that he had observed workers in the field using Kaylo. These workers would saw the Kaylo and generate dust, but would not be using respirators at the time.

### E. *Trial Proceedings.*

The Sparkses filed their complaint for personal injuries and loss of consortium on April 11, 1991. The complaint alleged a number of causes of action, including negligence and strict liability, and named over 40 defendants, including appellant Owens-Illinois. A first amended complaint was filed on April 16, 1991. Owens-Illinois answered the first amended complaint on May 29, 1991. Jury trial commenced on October 21, 1991, in department 5 of the San Francisco Superior Court, the Honorable Roy L. Wonder, presiding.

Prior to trial, both plaintiffs and defendants filed a large number of motions *in limine*. Plaintiffs moved to exclude evidence of the knowledge of the Navy regarding asbestos exposure insofar as this evidence related to a defense of superseding cause. The trial court granted this motion. Plaintiffs also prevailed on their motion to exclude evidence on a "state-of-the-art" defense, on the ground that the case was to be tried solely on a "consumer expectation" theory and all claims for punitive damages were being waived.

Defendant Fibreboard Corp. made an *in limine* motion, with the apparent agreement of the other defendants, to preclude the medical experts from

---

[3]Appellant misrepresents the record when it states that Dr. Fowler concluded that Mr. Sparks's exposures to asbestos on the U.S.S. Bremerton, the U.S.S. Frontier, and at the Long Beach Naval Shipyard were all approximately equal. Rather, Dr. Fowler testified that he did not have sufficient information to assign numerical values to the cumulative exposure attributable to each of these situations.

testifying that a particular exposure was a "substantial factor" in causing Sparks's mesothelioma, or to give any testimony other than an opinion that a given exposure was the "more-probable-than-not" cause of the disease. The trial court denied Fibreboard's motion, but ruled that "the expert witnesses [would] not be permitted to use legal conclusions, legal language in testifying."

Also during the pretrial proceedings, the trial court ruled that Proposition 51 would apply to this case. The effect of that ruling was to limit the defendants' liability to the "amount allocated to that defendant in direct proportion to that defendant's percentage of fault." (Civ. Code, § 1431.2, subd. (a).)

During trial, which commenced in November 1991, the defendants attempted to introduce evidence of the Navy's knowledge of asbestos hazards. In each case, the plaintiffs objected on the basis of the *in limine* orders regarding superseding cause and the "state-of-the-art" defense. Owens-Illinois made no showing or argument that the evidence was admissible for any other purpose, and the objections were sustained.

Both Owens-Illinois and the plaintiffs submitted jury instructions specifying the "consumer expectation test" for determining whether a given product was defectively designed. (*Barker* v. *Lull Engineering Co.* (1978) 20 Cal.3d 413, 432 [143 Cal.Rptr. 225, 573 P.2d 443, 96 A.L.R.3d 1] (*Barker*); *Campbell* v. *General Motors Corp.* (1982) 32 Cal.3d 112, 118-119 [184 Cal.Rptr. 891, 649 P.2d 224, 35 A.L.R.4th 1036].) Owens-Illinois also requested BAJI No. 3.76, under which the jury was told that "A legal cause of injury, damage, loss, or harm is a cause which is a substantial factor in bringing about the injury, damage, loss or harm." The plaintiffs requested a slightly modified version of the standard jury instruction on "Concurring Causes," BAJI No. 3.77,[4] and Owens-Illinois joined in the plaintiffs' request for a modified version of former BAJI No. 3.78.[5] These instructions were adopted and given by the trial court.

---

[4]The modified version of BAJI No. 3.77 proposed by plaintiffs states: "There may be more than one legal cause of an injury. When the defective products of two or more persons contributes [*sic*] concurrently as legal causes of an injury, the product of each of said persons is a legal cause of the injury regardless of the extent to which each contributes to the injury. A cause is concurrent if it was operative at the moment of injury and acted with another cause to produce the injury. It is no defense that the negligent conduct or defective product of a person not joined as a party was also a legal cause of the injury."

[5]The modified version of former BAJI No. 3.78 states: "Where two or more causes combine to bring about an injury and any of them operating alone would have been sufficient to cause the injury, each cause is considered to be a legal cause of the injury if it is a material element and a substantial factor in bringing it about, even though the result would have occurred without it."

As to the parties' respective burdens of proof on the products liability claim and the allocation of fault for the plaintiffs' injuries, the jury was instructed as follows: "CHARLES and BETTY SPARKS have the burden of proving by a preponderance of the evidence all of the facts necessary to establish: [¶] 1. That defendant OWENS-ILLINOIS, INC.'s product failed to perform as safely as an ordinary consumer of that product would expect; [¶] 2. That the defect in design existed when the product left the defendant's possession; [¶] 3. That the design of the product was a legal cause of Mr. Sparks['s] injury; [] [¶] 4. That the product was used in a manner reasonably foreseeable by the defendant; [and]. The nature and extent of CHARLES SPARKS['s] and BETTY SPARK[s's] injuries. [¶] In order to attribute responsibility for plaintiffs' injuries to other companies, defendant OWEN-ILLINOIS, INC. has the burden of proving by a preponderance of the evidence all of the facts necessary to establish: [¶] 1. That CHARLES SPARKS was exposed to asbestos-containing products of other companies; [¶] 2. That the other companies' products failed to perform as safely as an ordinary consumer of those products would expect; [¶] 3. That the defects in design existed when the products left the other companies' possession; and [¶] 4. That the designs of the other companies' asbestos-containing products were a legal cause of CHARLES SPARKS['s] injury; [¶] 5. That the products of the other companies were used in a manner reasonably foreseeable by the other companies; and [¶] 6. The percentage of legal cause attributable to other companies."

Owens-Illinois also prepared and submitted a special verdict form that asked the jury to allocate fault between it and "all other companies." Plaintiffs submitted a special verdict form that asked the jury to allocate fault between Owens-Illinois and "all other persons." The trial court used Owens-Illinois's form.[6] The jury returned a verdict in favor of plaintiffs and allocated 100 percent of the fault to defendant Owens-Illinois.

## II. DISCUSSION

Owens-Illinois first claims there was no substantial evidence to support the jury's findings that: (1) Kaylo was a defective product; and (2) Owens-Illinois was 100 percent responsible for the Sparkses' injuries. ■ In reviewing these claims, we must resolve all conflicts in the evidence in favor of respondent, and indulge all legitimate and reasonable inferences in support of the judgment. (*Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].) Under this standard of review, we conclude that there was substantial evidence presented at trial to support the jury's findings.

---

[6]Question No. 7 of Owens-Illinois's special verdict form read as follows: "Assuming that 100% represents the total legal causes of Charles Sparks['s] and Betty Sparks's damages, what percentage of this 100% is attributable to Owens-Illinois, Inc., and what percentage is attributable to all other companies?"

A. *Substantial Evidence Supports the Jury's Finding That Kaylo Was Defective.*

■ Owens-Illinois contends that the jury verdict must be reversed because there was no showing that Kaylo was a defective product. That is, Owens-Illinois contends plaintiffs were required to show that high-temperature insulation such as Kaylo could have been more safely designed, i.e., without asbestos, for use aboard Navy ships. Respondent argues that it was not required to make such a showing in this case, in which the jury was properly instructed to apply only the "consumer expectation" test to determine whether appellant's product was defectively designed. (*Barker, supra*, 20 Cal.3d at p. 432.) Respondent has the better of this argument.

■ It is well settled in California that a manufacturer may be held strictly liable in tort for placing a defective product on the market if that product causes personal injury, provided that the injury resulted from a use of the product that was reasonably foreseeable by the defendant. (*Greenman v. Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 62-63 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049].) This doctrine of strict liability extends to products which have design defects, manufacturing defects, or "warning defects." (*Anderson v. Owens-Corning Fiberglas Corp.* (1991) 53 Cal.3d 987, 995 [281 Cal.Rptr. 528, 810 P.2d 549]; *Vermeulen v. Superior Court* (1988) 204 Cal.App.3d 1192, 1198 [251 Cal.Rptr. 805].)

■ The instant case involves only allegations of design defects. It is, thus, governed by *Barker, supra,* where our Supreme Court held that a product may be found defective in design under either of two alternative theories. "First, a product may be found defective in design if the plaintiff establishes that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner. (20 Cal.3d at p. 432.) Under this first, so-called "consumer expectation test," a plaintiff is required to produce evidence of the "objective conditions of the product" as to which the jury is to employ its "own sense of whether the product meets ordinary expectations as to its safety under the circumstances presented by the evidence." (*Campbell v. General Motors Corp., supra,* 32 Cal.3d at p. 126, fn. omitted.)

The second prong of the *Barker* test for design defects is as follows: "[A] product may alternatively be found defective in design if the plaintiff demonstrates that the product's design proximately caused his injury and the defendant fails to establish, in light of the relevant factors, that, on balance, the benefits of the challenged design outweigh the risk of danger inherent in such design." (*Barker, supra,* 20 Cal.3d at p. 432.) In order to satisfy its

burden under this so-called "risk-benefit" theory, the defendant manufacturer may—but is not required to—present evidence of the feasibility of a safer alternative design, the financial cost of an improved design, and any adverse consequences to the product or the consumer from the alternative design. (*Id.* at pp. 431-432.)

The plaintiffs in this case limited their theory of recovery by electing to proceed only under the "consumer expectation test" for design defects. Owens-Illinois contends, however, that it was error to allow the plaintiffs to proceed in this fashion because the "consumer expectation test" is inappropriate in this case in that the undisputed evidence establishes that an Kaylo was "the best possible product that could have been manufactured." Owens-Illinois further contends that plaintiffs were required—and failed—to prove that there was a safer alternative design for Kaylo. We reject these arguments, which are devoid of factual and legal support.[7]

Our Supreme Court recently analyzed the circumstances under which the "consumer expectation test" should, and should not, be employed. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548 [34 Cal.Rptr.2d 607, 882 P.2d 298] (*Soule*).) The court held that "the consumer expectations test is reserved for cases in which the *everyday experience* of the product's users permits a conclusion that the product's design violated *minimum* safety assumptions, and is thus defective *regardless of expert opinion about the merits of the design.*" (*Id.* at p. 567, italics in original.)[8] The *Soule* court further held that where the consumer expectation test applies, evidence of the relative risks and benefits of the design is irrelevant and inadmissible: "If the facts permit such a conclusion, and if the failure resulted from the product's design, a finding of defect is warranted without any further proof. The manufacturer *may not defend* a claim that a product's design failed to perform as safely as its ordinary consumers would expect by presenting expert evidence of the design's relative risks and benefits." (*Id.* at p. 566, original italics and fn. omitted, italics added.)

On the other hand, our Supreme Court held that the "consumer expectation test" should *not* be used where the alleged injury resulted from products whose characteristics or performance are beyond the understanding or common experience of those who ordinarily use them: "[W]hen the ultimate

[7]Owens-Illinois misrepresents the state of the record when it contends that Kaylo was undisputedly the "best possible product that could have been manufactured." There is *no* evidence cited by either party on the issue of alternative designs for high-temperature insulation such as Kaylo.

[8]This will be true in situations where " 'ordinary knowledge . . . as to . . . [the product's] characteristics' (Rest.2d Torts . . . § 402A, com. i., p. 352), may permit an inference that the product did not perform as safely as it should." (*Soule, supra,* 8 Cal.4th at p. 566.)

issue of design defect calls for a careful assessment of feasibility, practicality, risk, and benefit, the case should not be resolved simply on the basis of ordinary consumer expectations. As *Barker* observed, 'past design defect decisions demonstrate that, as a practical matter, in many instances it is simply impossible to eliminate the balancing or weighing of competing considerations in determining whether a product is defectively designed or not. . . .' " (*Soule, supra,* 8 Cal.4th at pp. 562-563.) Such "instances" include claims involving "complex" products which "cause injury in a way that does not engage its ordinary consumers' reasonable minimum assumptions about safe performance." (*Id.* at pp. 566-567.) "The crucial question in each individual case is whether the circumstances of the product's failure permit an inference that the product's design performed below the legitimate, commonly accepted minimum safety assumptions of its ordinary consumers." (*Id.* at pp. 568-569, fn. omitted.)

The *Soule* case provides a good example of a situation in which the consumer expectation test is not appropriate. There, the court was confronted with a complicated claim that General Motors' defective design of the wheel assembly and front floorboard enhanced the injuries the plaintiff suffered when another car collided with the left front wheel area of her automobile. As the court explained, "Plaintiff's theory of design defect was one of technical and mechanical detail. It sought to examine the precise behavior of several obscure components of her car under the complex circumstances of a particular accident. The collision's exact speed, angle, and point of impact were disputed. It seems settled, however, that plaintiff's Camaro received a substantial oblique blow near the left front wheel, and that the adjacent frame members and bracket assembly absorbed considerable inertial force." (8 Cal.4th at p. 570.) The court held that the consumer expectation test should not have been used: "An ordinary consumer of automobiles cannot reasonably expect that a car's frame, suspension, or interior will be designed to remain intact in any and all accidents. Nor would ordinary experience and understanding inform such a consumer how safely an automobile's design should perform under the esoteric circumstances of the collision at issue here. Indeed, both parties assumed that quite complicated design considerations were at issue, and that expert testimony was necessary to illuminate these matters." (*Ibid.*)

There were neither "complicated design considerations," nor "obscure components," nor "esoteric circumstances" surrounding the "accident" in the instant case. Kaylo was a common type of asbestos-containing block insulation. It was a simple, stationary product in its ordinary uses. Because it was made of friable material that had to be cut and shaped to perform its insulating function on irregularly shaped objects, it generated large amounts

of asbestos-laden dust during normal installation, inspection, removal, and replacement processes. The design failure was in Kaylo's emission of highly toxic, respirable fibers in the normal course of its intended use and maintenance as a high-temperature thermal insulation. It is a reasonable inference from the evidence that this emission of respirable fibers, which were capable of causing a fatal lung disease after a long latency period, was a product failure beyond the "legitimate, commonly accepted minimum safety assumptions of its ordinary consumers." (*Soule, supra,* 8 Cal.4th at pp. 569-570.)

The instant case is analogous to *West* v. *Johnson & Johnson Products, Inc.* (1985) 174 Cal.App.3d 831 [220 Cal.Rptr. 437, 59 A.L.R.4th 1], a case which was discussed by the Supreme Court in *Soule, supra,* 8 Cal.4th at page 565. In *West,* the plaintiff became seriously ill in February 1980 during her menstrual period. At the time, there were growing indications that tampon use sometimes caused toxic shock syndrome (TSS). After reading medical reports, plaintiff's physicians belatedly concluded that she had suffered TSS caused by tampons produced by the defendant. At trial, experts debated the nature of plaintiff's illness, and disputed whether the tampon design and materials used by the defendant encouraged TSS. The trial court instructed the jury only on the "consumer expectation test" prong of *Barker,* and the jury returned a verdict in favor of the plaintiff. (*West, supra,* 174 Cal.App.3d at p. 840.)

On appeal, the defendant contended that the risk-benefit test alone was proper. The Court of Appeal rejected this argument, holding that the jury was properly instructed, and that use of the "consumer expectation test" is not precluded in complex cases involving expert testimony.[9] Significantly, the court reasoned that, in a time before there was general awareness and warnings about TSS, the plaintiff "had every right to expect" that use of such a seemingly innocuous product "would not lead to a serious (or perhaps fatal) illness." (*West* v. *Johnson & Johnson Products, Inc., supra,* 174 Cal.App.3d at p. 867.)

The same is true here. Plaintiffs presented ample evidence that, when used in the intended manner, Kaylo violated the minimum safety expectations of its ordinary consumers. For example, Ralph David testified that he and other insulators freely manipulated asbestos-containing insulation products such as Kaylo during both installation and removal procedures, all the while assuming that it was innocuous, just part of their job. Samuel Schillaci, the Owens-Illinois employee who was responsible for the Kaylo division in the

[9]The *Soule* court reached a similar conclusion, rejecting General Motors' argument that consumer expectations are irrelevant where expert testimony is required as proof of product failure and causation. (8 Cal.4th at p. 569, fn. 6.)

1950's, testified that he frequently observed workers in the field sawing Kaylo, generating dust, but not wearing respirators. Plaintiff himself testified that he and all the other workers around him on the Bremerton worked with asbestos-containing insulation and cleaned up after such projects in a manner that caused large amounts of dust to circulate throughout the work area, without any special precautions against the generation, distribution or inhalation of the asbestos fibers, and without any expectation that the respirable fibers could cause serious illness. The jury could infer from this and other testimony that the ordinary users of Kaylo in the late 1950's and early 1960's did not expect to develop a fatal disease from simply breathing Kaylo dust and, thus, that the product's performance did not meet the "minimum safety assumptions of its ordinary consumers." (*Soule, supra,* 8 Cal.4th at p. 569.) We conclude that the trial court did not err by instructing the jury only on the "consumer expectation test," and that there was substantial evidence to support the jury finding of a design defect in Kaylo.

B. *Substantial Evidence Supports the Jury's Finding on Causation and Its Allocation of Fault.*

 Owens-Illinois next argues that there was no evidence to support the jury's finding that a defect in the design of its product, Kaylo, was the sole legal cause of the plaintiffs' injuries. The substantial evidence standard of review also applies to the jury's findings on the issue of causation (*Akers v. Kelley Co.* (1985) 173 Cal.App.3d 633, 647-648 [219 Cal.Rptr. 513]), and its allocation of fault among concurrent or alternative tortfeasors (*Metzger v. Barnes* (1977) 74 Cal.App.3d 6, 9-10 [141 Cal.Rptr. 257]; see also *Bates v. John Deere Co., Inc.* (1983) 148 Cal.App.3d 40, 52 [195 Cal.Rptr. 637, 60 A.L.R.4th 663]).[10]

Plainly, there was substantial evidence that Kaylo was *a* legal cause of Sparks's injuries. In a personal injury action, causation must be proven within a reasonable medical probability based on expert testimony; a mere possibility is insufficient. (*Jones v. Ortho Pharmaceutical Corp.* (1985) 163 Cal.App.3d 396, 402 [209 Cal.Rptr. 456].) A possible cause becomes "probable" when, in the absence of other reasonable causal explanations, it is more likely than not that the injury resulted from its action. (*Id.* at p. 403.)[11] The testimony of plaintiffs' medical experts was clearly

[10]Owens-Illinois does not directly challenge the jury instructions given on the issues of causation or the burdens of proof on those issues.

[11]In a case decided while appellant's petition for rehearing was pending, Division One of this court discussed the burdens of proof on the issues of causation for asbestos-related personal injuries. (*Lineaweaver v. Plant Insulation Co.* (1995) 31 Cal.App.4th 1409, 1416 [37 Cal.Rptr.2d 902].) Writing for the majority, Justice Strankman held that the plaintiff

sufficient to support a jury finding that Owens-Illinois's product, Kaylo, was more likely than not the source of asbestos fibers that caused Mr. Sparks's mesothelioma. Each of the experts testified that Sparks's exposure to asbestos-containing products during his time aboard the Bremerton was the first, and most intense period of exposure in his lifetime. Each of the medical experts also testified that Sparks's asbestos exposure on the Bremerton was almost certainly sufficient to have caused his mesothelioma. At least one of these experts further stated that Sparks's exposure to Kaylo during the decommissioning was, by itself, sufficient to have caused his disease.

Although it is a closer question, we also conclude that there was sufficient evidence to support a finding that Owens-Illinois's product was the *sole* legal cause of plaintiffs' injuries. There are several ways the jury could have reached such a conclusion, despite evidence indicating that Mr. Sparks was exposed to other asbestos-containing products both on board the Bremerton and afterwards. First, based on the evidence presented about the insulators' strong preference for using Kaylo, the jury reasonably could have believed that Owens-Illinois's product was more likely than not the type of block insulation used on the Bremerton. As to the other types of asbestos-containing products to which Sparks was allegedly exposed during the decommissioning of the Bremerton—pads, gaskets, asbestos cloth and asbestos cement—the jury might have concluded that some or all of the other asbestos-containing products were not defectively designed. For example, Sparks testified he had to remove cloth-covered pads, which contained a soft, fluffy material from the valves of the Bremerton steam lines. He himself never cut into these pads, and did not recall ever seeing one with cuts or tears in it.

has the burden of proving that "there [is] a reasonable medical probability based upon competent expert testimony that the defendant's conduct contributed to the plaintiff's injury." The court further observed that many factors are relevant in assessing the medical probability that an asbestos exposure was a "substantial factor" in causing the plaintiff's disease: "Frequency of exposure, regularity of exposure, and proximity of the asbestos product to plaintiff are certainly relevant, although these considerations should not be determinative in every case. [Citation.] Additional factors may also be significant in individual cases, such as the type of asbestos product to which plaintiff was exposed, the type of injury suffered by the plaintiff, and other possible sources of plaintiff's injury." (31 Cal.App.4th at p. 1416.) As to burden of proof for fault allocation among defendants whose products have been shown to be a "substantial factor" in causing the plaintiff's injury, the *Lineaweaver* majority observes that such defendants "would be entitled to limit damages assessed against them if they proved the harm was capable of apportionment among them." (*Id.*, at p. 1417.)

Although these formulations of the parties' burdens of proof are slightly different than those used to instruct the jury in this case, appellant did not challenge the pertinent jury instructions in this appeal. Furthermore, *Lineaweaver* is distinguishable from the instant case in that it involved asbestosis (not mesothelioma) and negligence (not, as in our case, strict liability). Indeed, as Justice Newsom observes in his concurring opinion, the standard of causation for mesothelioma may well be different than for asbestosis because the latter disease is more clearly " 'cumulative in nature.' " (31 Cal.App.4th at p. 1423; see also *Menne v. Celotex Corp.* (10th Cir. 1988) 861 F.2d 1453, 1456 [mesothelioma can be caused by as little as an intense two- to three-month episode of breathing asbestos dust].)

The pads were completely stitched together, and Sparks did not recall any of them "coming apart" as he removed and replaced them. Sparks also testified that he used a chisel or chipping hammer or putty knife to remove hardened gaskets and mud-type insulation from the flanges on the steam pipes. Owens-Illinois points to no evidence indicating that these activities generated significant amounts of dust or respirable asbestos fibers, as did the removal of Kaylo.

Even if the jury believed *all* asbestos-containing products were defective in design, it might nevertheless have found that there was insufficient evidence that exposure to products other than Kaylo was "a substantial factor" in bringing about Mr. Sparks's disease. In this regard, Owens-Illinois undisputedly had the burden to establish concurrent or alternate causes by proving: that Sparks was exposed to defective asbestos-containing products of other companies; that the defective designs of the other companies' products were legal causes of the plaintiffs' injuries; and the percentage of legal cause attributable to the other companies. (*Vermeulen* v. *Superior Court, supra,* 204 Cal.App.3d at p. 1202; see also *American Motorcycle Assn.* v. *Superior Court* (1978) 20 Cal.3d 578, 599 [146 Cal.Rptr. 182, 578 P.2d 899]; *Gentry Construction Co.* v. *Superior Court* (1989) 212 Cal.App.3d 177, 181-182 [260 Cal.Rptr. 421].)

There was nothing in this case to prevent Owens-Illinois from presenting evidence and arguing that other equally defective products were concurrent causes of Sparks's mesothelioma. In fact, Owens-Illinois did just that. As far as the record discloses, however, Owens-Illinois did not carry its burden and, apparently, the jury was not convinced. The evidence about other products was developed by Owens-Illinois primarily by eliciting the names of other products and their manufacturers during cross-examination of the plaintiffs' witnesses. Owens-Illinois offered no independent evidence—from either lay or expert witnesses—about the specific properties (e.g., the asbestos content), performance, extent of usage, or effects of the other products to which Sparks was exposed on the Bremerton. Nor did it develop the details of Sparks's exposures to asbestos-containing products after his stint on the Bremerton. In short, Owens-Illinois did not prove any equitable indemnity claim against any other manufacturer and did not, therefore, prove any basis for an allocation of fault to any other company or companies.

Owens-Illinois contends, however, that each of the plaintiffs's experts testified that Sparks's mesothelioma was "caused" by all of the asbestos exposures. In fact, these experts testified that all of the asbestos exposures contributed to the *risk* that Sparks would develop mesothelioma during his lifetime. The only exposure which was identified as being sufficient in and

of itself to have caused Sparks's mesothelioma was the exposure to Owens-Illinois products on the Bremerton in 1960.

In addition, Owens-Illinois arguably invited the jury's fault allocation by arguing that, in order to prevail, the plaintiffs had to prove that: (1) Mr. Sparks inhaled Kaylo fibers during the Bremerton decommissioning in 1960; and (2) those particular Kaylo fibers were retained in his lungs, and that those particular fibers—and *not* any other asbestos fibers—were the cause of his disease. As we have already discussed, there was ample evidence from which the jury could have found each of those facts. We conclude that the jury's fault allocation was supported by substantial evidence.

### C. *Owens-Illinois Waived Its Claim to Have a Portion of the Plaintiffs' Noneconomic Damages Allocated to Sparks's Employer, the United States Navy.*

Finally, Owens-Illinois contends that the trial court erred by excluding all evidence of negligence by Sparks's employer—the United States Navy—and that it was, thus, prevented from obtaining a fault allocation that would have relieved it of responsibility for that portion of the plaintiffs' noneconomic damages which can be attributed to the Navy pursuant to Proposition 51. In essence, Owens-Illinois's argument is that it is entitled to retroactive application of the rule of *DaFonte* v. *Up-Right, Inc., supra,* 2 Cal.4th 593 (*DaFonte II*). In that case, our Supreme Court interpreted Proposition 51 to require that, notwithstanding the immunity of employers from tort suits for workplace injuries suffered by employees (Lab. Code, §§ 3602, 3864), a defendant other than the employer can be held liable only for the percentage of noneconomic damages which corresponds to its proportionate share of fault.

Prior to trial, plaintiffs successfully moved the trial court for an order excluding evidence that the Navy was aware of but disregarded the risks associated with asbestos-containing insulation, insofar as such evidence was offered to show that the Navy's negligence was a superseding cause of Sparks's injuries. Owens-Illinois admits that it made no attempt to present evidence of the Navy's responsibility for Sparks's injuries for any other purpose. It contends, however, that it was precluded from doing so because of the Court of Appeal decision in *DaFonte* v. *Up-Right, Inc.** (Cal.App.) (*DaFonte I*), which was decided on June 27, 1991, before trial commenced in this matter. In that opinion, the Fifth District held that the liability of a third party tortfeasor and the plaintiff's employer are separate and distinct and that, by its own terms, Proposition 51 only applied to joint and several

---

*Reporter's Note: Review granted October 3, 1991 (S022331).

liability. Thus, Owens-Illinois argues that it could not have sought an allocation of fault to the United States Navy. We reject this argument.

The California Supreme Court granted review of *DaFonte I* on October 3, 1991, *also* before the trial started. Accordingly, at the time of trial, it remained an open question of California law whether a third party tortfeasor such as Owens-Illinois was entitled to have the jury consider the responsibility of the plaintiff's employer for the alleged injuries when making its fault allocation pursuant to Proposition 51.[12] There was, thus, nothing to prevent Owens-Illinois from at least offering evidence, jury instructions and special verdict forms under which it could have sought an apportionment of fault to the United States Navy. Likewise, the trial court was free to disagree with the Fifth District analysis and allow the issue to go the jury.[13] We conclude that Owens-Illinois waived any claim to have its share of the fault for plaintiffs noneconomic damages reduced in proportion to the fault, if any, of Sparks's employer.[14]

### III. CONCLUSION

For all the foregoing reasons, the judgment of the trial court is affirmed in its entirety.

Kline, P. J., and Smith, J., concurred.

A petition for a rehearing was denied February 16, 1995, and appellant's petition for review by the Supreme Court was denied April 13, 1995.

---

[12]The California Supreme Court reversed *DaFonte I* on May 4, 1992. (*DaFonte II, supra*, 2 Cal.4th 593.)

[13]Indeed, if they had done so and the jury had found that the Navy was partially responsible for plaintiffs' injuries, there would have been a full record from which we could determine if such a fault allocation was supported by substantial evidence. We decline to give Owens-Illinois a second bite at the apple to make a record on this issue when it was free to do so in the first trial.

[14]Because of our disposition of this issue, we need not address the question raised by respondent as to whether the trial court properly applied Proposition 51 to this case in the first place.