Filed 3/4/26; Modified and Certified for Pub. 4/1/26 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| MALLORY HARCOURT,<br><br>     Plaintiff and Appellant,<br><br>     v.<br><br>TESLA, INC.,<br><br>     Defendant and Respondent. | H052308<br>(Santa Clara County<br>Super. Ct. No. 19CV358488) |

In 2018, four days after purchasing a Tesla Model X SUV, Mallory Harcourt was injured when she left her key fob in the car, her two-and-half-year-old son climbed in, he started the car, and the car slammed into her.  Harcourt sued Tesla, Inc. (Tesla), claiming a design defect allowed the child to start the car.  Before trial, she decided to rely solely on the consumer expectations test to prove the alleged defect.  After Harcourt rested, Tesla filed a motion for a nonsuit, which the trial court granted on the ground that Harcourt had not shown that the consumer expectations test—which is reserved for cases where ordinary users have "commonly accepted minimum safety assumptions" about a product (*Soule v. General Motors Co*. (1994) 8 Cal.4th 548, 569 (*Soule*))—applies in this case.  As explained below, we agree and affirm.

# I. BACKGROUND

## A. The Incident

On December 23, 2018, Harcourt, who was then eight-and-a-half months pregnant, purchased a Model X. Four days later, she parked the car in her driveway. Leaving her purse with the key fob for the car in the car, Harcourt took B.H., her two-and-a-half-year-old son, out of his car seat and proceeded with him toward the house. Finding she did not have her house key, Harcourt returned with B.H. to the car, but before finding the key she realized that B.H.'s diaper needed to be changed. Harcourt therefore opened the driver's side rear car door to retrieve the diaper bag and the driver's door to press the garage door opener. Leaving both car doors open—and the key fob in the car—Harcourt and B.H. walked toward the garage so that Harcourt could change his diaper there.

As Harcourt began setting up the changing pad, she realized that B.H. was not with her and that the Model X was moving toward her. Harcourt pivoted toward the vehicle in an effort to make it "see her" and stop. However, the front bumper struck Harcourt on the bottom of her abdomen, picked her up, and pushed her back until it pinned her against the wall. Harcourt suffered fractures to her leg and pelvis, as well as a traumatic wound to her leg and soft tissue damage. Approximately a week later, labor was induced, and Harcourt gave birth to a daughter, who was uninjured.

After Harcourt was hit, she saw B.H. pop up inside the Model X. The car's data logs showed that B.H., who apparently had climbed inside, pressed the brake pedal, which caused the driver's side door to close. B.H. then shifted the car into drive by simultaneously pressing the brake pedal and moving the gear selector stalk on the side of the steering wheel column, released the brake pedal, and pressed the accelerator pedal. The car began moving, increasing speed to three miles per hour, but slowed to nearly a stop before increasing speed again to eight-and-a-half miles per hour before again slowing. The car was traveling approximately six to seven miles per hour when it

2

impacted Harcourt. Three seconds after the impact, the car auto shifted into park. Approximately a minute later, B.H. again pushed the accelerator pedal, but the car remained in park and did not move further.

## B. The Model X

The Model X was unusual in several respects. Unlike most cars, the Model X was not equipped with a start/stop button. Instead, the driver's door would open if a user approached with the key fob, and once the key fob was inside, the car would turn on. Thus, a driver did not need to press a button or insert a key into the ignition to start the car; instead, if the key fob was in the car, a driver could start it by pressing the brake pedal and shifting the car into gear. The gear shifter was similar in size and location to a windshield wiper, which a driver would click up or down to shift the car into reverse or drive.

The car also was equipped with several safety features. Among these was a PIN-to-Drive feature, which, once set up, required an operator to enter a 4-digit personal identification number before driving the vehicle. Harcourt, who did not read the vehicle's manual before the accident, testified that she was unaware of this feature before the accident but, had she known about the feature, she would have activated it. The vehicle was also equipped with an "obstacle aware acceleration" feature, which activated during the incident at issue to slow the vehicle down, a "brake override system," which would reduce torque on the engine and prevent the vehicle from moving forward, and an "auto shift to park" feature, which would shift the vehicle into park in certain situations. Harcourt also did not know about these features.

## C. The Proceedings Below

### 1. Harcourt's Pleadings

In May 2019, Harcourt, individually and on behalf of her two minor children, sued Tesla, asserting six causes of action, including strict product liability as well as negligence, breach of warranty, intentional misrepresentation, and consumer fraud. In

September 2019, Harcourt amended her complaint, dropping a statutory claim. Finally, in April 2024, after the case was called for trial, Harcourt requested and received leave to file a second amended complaint. In the second amended complaint, Harcourt was the sole plaintiff, and she asserted a single cause of action for strict product liability, alleging that her Model X injured her when it "did not perform as an ordinary consumer would have expected it to perform when used or misused in a reasonably foreseeable way."

### 2. Harcourt's Evidence

At the beginning of trial, Harcourt notified the court that she intended to assert a design defect solely under the consumer expectations test. The trial court accepted Harcourt's "abandonment and waiver of any effort to establish liability under the risk benefit test." The court also granted Harcourt's request to limit evidence concerning defects to that relevant to the consumer expectations test.

At trial, Harcourt testified that she left her key fob in the car, but it did not occur to her that it would be dangerous to do so or to leave the door open with her young son around. Harcourt explained that she did not believe that her son could start and operate the car "because normally you would have to get in the car, put your foot on the brakes, start the car, press the button. There is some type of thing [such as pressing a button or inserting a key into the ignition] before you are able to put it into gear . . . ."

Harcourt admitted that, in the days preceding the accident, B.H. sat in the front passenger seat of a Tesla when the family was at the showroom purchasing the vehicle. She also admitted that for Christmas B.H. had received a ride-in Audi toy that a child could drive while a parent walked alongside, which included an on/off switch, a steering wheel, and a single pedal to accelerate.

### 3. The Motion for Nonsuit

After Harcourt rested, Tesla moved for nonsuit. Tesla argued that Harcourt had not presented evidence showing that the consumer expectations test applies to this case. In particular, Tesla argued, "[t]he ordinary consumer has no idea how the vehicle should

4

have performed once B.H. climbed into it, much less how safe the vehicle could have been made in the context of this case."

Harcourt opposed, arguing that the Model X violated ordinary consumer expectations because "[i]t allowed a two-year-old, in 2.5 seconds, to be able to move a car into his mother. Start, put in drive, and move." The trial court observed that this contention raised questions about what features, in addition to the brake pedal and gear shifter, might be relevant to determining whether the car performed as safely as expected under the circumstances. When asked to identify the specific defect or "objective feature that performed less safely than an ordinary consumer would expect," Harcourt responded that "[r]isk-benefit . . . is where you get into it's missing a start button" but that she "did not present any of that because it is within an ordinary consumer's expectation that a two-year-old . . . cannot start, move into gear, and drive a vehicle."

The trial court granted Tesla's motion. In so doing, the court noted that Harcourt "may be right" that the Model X is defective. However, the court continued, "Plaintiff chose to pursue this claim exclusively on a theory that in the context of the facts and circumstances of this particular case the Model X was a product about which the ordinary consumer could have formed reasonable minimal safety expectations," and "[o]n this theory, Plaintiff is wrong."

The trial court reasoned that the consumer expectations test is inapplicable for two reasons. First, Harcourt failed to adequately describe the relevant features of the Model X. When a product is within the common experience of ordinary consumers, the trial court observed, to establish a design defect under the consumer expectations test, a plaintiff must identify the objective features of the product relevant to evaluating its safety. When asked to do so, Harcourt responded the Model X failed to prevent a young child from starting it, putting it in gear, and moving it. "These broad and sweeping statements," the court concluded, "are a far cry from establishing objective features of the vehicle about which consumers can form minimum safety expectations."

5

Second, the court reasoned that, if the claimed defect is not the failure of a particular and identifiable component, it is the failure of a system, and the consumer expectations test does not apply to the system here.  The Model X's safety system, the court noted, included many components such as the PIN-to-Drive feature, which are "complicated and outside the minimum safety expectations of ordinary consumers."  In addition, the misuse of the product in this case "involved a nuanced and unique set of circumstances outside the knowledge of the ordinary consumer."  Because the Model X's safety system "falls well outside the realm of ordinary consumers' common knowledge or ability to form minimum safety expectations," the trial court concluded that the consumer expectations test was inapplicable.

Finally, because Harcourt had waived use of the risk-benefit test to prove strict liability and dismissed claims besides strict liability, the trial court concluded that there were no claims for the jury to resolve, and it granted Tesla's motion for nonsuit and dismissal.

### 4. *Judgment*

On May 3, 2024, the trial court entered an order and judgment granting nonsuit and dismissing the action.  On July 2, 2024, Harcourt timely noticed an appeal from the judgment.  Harcourt also filed a motion for a new trial, which the trial court denied, but Harcourt did not appeal the denial.

## II. DISCUSSION

Harcourt contends that the consumer expectations test applies here, and the trial court erred in granting nonsuit.  We review the nonsuit ruling de novo.  (See, e.g., *Carachure v. Scott* (2021) 70 Cal.App.5th 16, 25.)  As explained below, we conclude that the consumer expectations test does not apply to the circumstances of this case.

### A. The Consumer Expectations Test

Although the Supreme Court recognized the consumer expectations test nearly fifty years ago in *Barker v. Lull Engineering Co., Inc*. (1978) 20 Cal.3d 413 (*Barker*), it is

6

not as widely used or as well-known as other strict liability theories, likely because the Supreme Court later imposed significant restrictions on the test.

Under products liability law, "manufacturers are not insurers of their products," and generally they are liable "only when 'defects' in their products cause injury." (*Soule*, *supra*, 8 Cal.4th at p. 568, fn. 5.) Products may have defects in their manufacture or design. (*Id.* at p. 560; see also *Anderson v. Owens-Corning Fiberglas Corp.* (1991) 53 Cal.3d 987, 995 [noting that products also may have " 'warning defects,' i.e., inadequate warnings or failures to warn"].) And, as *Barker* recognized, design defects may be shown under one of two tests. (*Barker*, *supra*, 20 Cal.3d at pp. 426-427.) "First, under the so-called consumer expectations test, a design is defective 'if the plaintiff demonstrates that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.' " (*Kim v. Toyota Motor Corp.* (2018) 6 Cal.5th 21, 30 (*Kim*).) "Second, under the risk-benefit test . . . a design is defective 'if . . . the jury finds that the risk of danger inherent in the challenged design outweighs the benefit of such design.' " (*Ibid*.)

"The consumer expectations test is not suitable in all cases" for the simple reason that consumers do not have an expectation in all cases how safely a product should perform. (*Johnson v. United States Steel Corp.* (2015) 240 Cal.App.4th 22, 32.) "[A] complex product, even when it is being used as intended, may often cause injury in a way that does not engage its ordinary consumers' reasonable minimal assumptions about safe performance." (*Soule*, *supra*, 8 Cal.4th at pp. 566-567.) Indeed, the ordinary consumer of a product "simply has 'no idea' how it should perform in all foreseeable situations, or how safe it should be made against all foreseeable hazards." (*Id*. at p. 567; see also *Barker*, *supra*, 20 Cal.3d at p. 430 [" '[I]n many situations . . . the consumer would not know what to expect, because he would have no idea how safe the product could be made.' "].) Accordingly, "the consumer expectations test is reserved for cases in which the *everyday experience* of the product's users permits a conclusion that the product's

7

design violated *minimum* safety assumptions." (*Soule*, at p. 567.) Consequently, in determining whether the consumer expectations test applies to a case, the crucial question is whether "the product's design performed below the legitimate, commonly accepted minimum safety assumptions of its ordinary consumers." *(Id.* at p. 569*.)*

The Supreme Court has identified two circumstances in which ordinary consumers form minimum safety assumptions about a product. The first circumstance is a common safety device used in a common circumstance. In *Campbell v. General Motors Corp.* (1982) 32 Cal.3d 112 (*Campbell*), a woman riding a city bus was sitting in a forward-facing seat behind a lateral-facing double seat. (*Id.* at pp. 115-116.) When the bus turned sharply, she was thrown to the floor because there was nothing in front of her to grab, and she injured her hip. (*Id.* at pp. 116-117.) The woman sued the manufacturer, claiming that the bus was defectively designed because there was no guardrail or handrail within reach of the seat where she sat. (*Id.* at p. 120.) Even though the woman presented no expert testimony, the Supreme Court held that her testimony along with photos of the bus's design features was sufficient to raise a triable issue whether the bus was defectively designed, because "public transportation is a matter of common experience," and "the need for a 'grab bar' or pole to steady oneself when a bus turns a sharp corner is a matter within the common experience of lay jurors." (*Id.* at pp. 125, 126.)

The Supreme Court also has indicated that the consumer expectations test may apply in a second circumstance: when there is an extreme product failure or malfunction. In *Soule, supra*, 8 Cal.4th at page 569, the Supreme Court noted that "[i]n particular circumstances, a product's design may perform so unsafely that the defect is apparent to the common reason, experience, and understanding of its ordinary consumers," and a design defect may be found under the consumer expectations test. The examples given by the Court suggest that these "particular circumstances" may be limited: The Supreme Court observed that a jury could find that a "car failed to perform as safely as its ordinary customers would expect" if it were "to explode while idling at stoplights, experience

8

sudden steering or brake failure as [it] leave[s] the dealership, or roll over and catch fire in two-mile-per-hour collisions." (*Id*. at p. 566, fn. 3.)

However, *Soule* admonished that the consumer expectations test should not be applied in all cases. "[T]he jury may not be left to find a violation of ordinary consumer expectations whenever it chooses." (*Soule*, *supra*, 8 Cal.4th at p. 568.) "Unless the facts actually permit an inference that the product's performance did not meet the minimum safety expectations of its ordinary users, the jury must engage in the balancing of risks and benefits required by the second prong of *Barker*"—that is, the risk-benefit test. (*Ibid*.) Moreover, *Soule* held that the consumer expectations test did not apply in the case before it: a car crash in which the front wheel tore loose from its bracket, collapsed rearward and inward, and caused the toe pan underneath the pedals to crumple and crushed the driver's ankles. (*Id*. at pp. 556-557, 570.) "[O]rdinary experience and understanding," the Court reasoned, would not inform an ordinary consumer "how safely an automobile's design should perform under the esoteric circumstances of the collision at issue." (*Id*. at p. 570.)

In applying the Supreme Court's decisions concerning the consumer expectations test, lower courts have applied it beyond the "res ipsa-like" (*Pruitt v. General Motors Corp.* (1999) 72 Cal.App.4th 1480, 1484 (*Pruitt*)) examples given by *Soule*. For instance, courts have applied the test to the deployment or failure to deploy of air bags on the theory that airbags are "by now [a] commonplace product" about which "an ordinary consumer would be capable of forming an expectation." (*Bresnahan v. Chrysler Corp.* (1995) 32 Cal.App.4th 1559, 1568 [deployment in low-impact collision]; see *McCabe v. American Honda Motor Co*. (2002) 100 Cal.App.4th 1111, 1125 (*McCabe*) [failure to deploy in high-impact collision]; but see *Pruitt*, at pp. 1483-1484 [refusing to apply test to low-impact collision].) The consumer expectations test also has been applied to relatively simple matters not involving "concepts outside the scope of everyday experiences of the consumers of the product," such as whether warning lights were

9

properly placed on a forklift (*Demara v. The Raymond Corp.* (2017) 13 Cal.App.5th 545, 562) or the rearward collapse of a car's driver's seat during a collision (*Romine v. Johnson Controls, Inc*. (2014) 224 Cal.App.4th 990, 1003-1004). Finally, the consumer expectations test has been applied to asbestos-containing products that subjected consumers to "highly toxic, respirable fibers" capable of causing a fatal lung disease "in the normal course of its intended use." (*Sparks v. Owens-Illinois, Inc*. (1995) 32 Cal.App.4th 461, 475 (*Sparks*); accord *Saller v. Crown Cork & Seal, Inc*. (2010) 187 Cal.App.4th 1220, 1236; *Jones v. John Crane, Inc*. (2005) 132 Cal.App.4th 990, 1003.)

However, in other cases, the consumer expectations test has been held inapplicable. For example, because consumers have little knowledge about how drugs work or how to assess their safety, the consumer expectations test was held inapplicable where a plaintiff suffered a rare side effect from a drug. (*Trejo v. Johnson & Johnson* (2017) 13 Cal.App.5th 110, 160 (*Trejo*).) Similarly, the test was held inapplicable to a plaintiff who had "allergic and/or idiosyncratic reactions" to a product. (*Morson v. Superior Court* (2001) 90 Cal.App.4th 775, 795.) In addition, the consumer expectations test has been held inapplicable to unusual situations outside the ordinary knowledge of consumers such as accidents caused by separation of tire treads (*Stephen v. Ford Motor Co*. (2006) 134 Cal.App.4th 1363, 1365, 1370, fn. 6) or the operation of a car's roof in a rollover (*Mansur v. Ford Motor Co*. (2011) 197 Cal.App.4th 1365, 1377-1380) as well as to unusual products such as the coating for bathtubs (*Howard v. Omni Hotels Management Corp*. (2012) 203 Cal.App.4th 403, 424-425) or lap belts with more than two-point attachments (*Verrazono v. Gehl Co*. (2020) 50 Cal.App.5th 636, 642, 647).

Plaintiffs proceeding under the consumer expectations test bear the burden of showing that "the product failed to satisfy ordinary consumer expectations as to safety." (*Campbell*, *supra*, 32 Cal.3d at p. 126; see also *id*. at p. 126, fn. 6 [noting that the test focuses on the expectations of a "hypothetical reasonable consumer"].) To satisfy this burden, a plaintiff must establish, "as a question of foundation and in the context of the

10

facts and circumstances of the particular case, whether the product is one about which the ordinary consumer can form reasonable minimum safety expectations." (*McCabe*, *supra*, 100 Cal.App.4th at p. 1125, fn. 7; see *Soule*, *supra*, 8 Cal.4th at p. 568.) The evidence needed to satisfy this burden "cannot be reduced to an easy formula." (*Campbell*, at p. 127.) However, where a product is "within the common experience of ordinary consumers, it is generally sufficient if the plaintiff provides evidence concerning (1) his or her use of the product; (2) the circumstances surrounding the injury; and (3) the objective features of the product which are relevant to an evaluation of its safety." (*Id.* at p. 127.)

Where the consumer expectations test does not apply, plaintiffs may use the risk-benefit test to prove design defects. (*Soule*, *supra*, 8 Cal.4th at p. 568.) Under this test, the plaintiff has burden of demonstrating that a product's design proximately caused the plaintiff's injury. (*Kim*, *supra*, 6 Cal.5th at p. 30.) If this burden is satisfied, the burden shifts to the defendant to show " 'that, on balance, the benefits of the challenged design outweigh the risk of danger inherent in such design.' " (*Ibid.*) In assessing whether the benefits of a design outweigh its risk, courts may consider, among other things, "the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design." (*Barker*, *supra*, 20 Cal.3d at p. 431.)

## B. Application

For reasons that the record does not make clear, Harcourt decided to proceed based solely on the consumer expectations test without also claiming a design defect under the risk-benefit test. This decision is somewhat surprising because there is no prior decision applying the consumer expectations test in a case such as this one. In addition, while Harcourt's briefs exhaustively review the cases applying the consumer expectations test, she fails to offer any clear explanation how the threshold requirement for applying the

11

test—that "the product's design performed below the legitimate, commonly accepted, minimum safety assumptions of its ordinary consumers" (*Soule*, *supra*, 8 Cal.4th at pp. 568-569)—should be applied in this case. As explained below, we conclude that this requirement is not satisfied here.

This case does not resemble any case in which the consumer expectations test previously has been held or said to apply. For example, this case does not involve an extreme malfunction or failure like those identified by the Supreme Court in *Soule* in which a car exploded while idling at a stoplight or rolled over and caught fire in a two-mile-per-hour collision. (*Soule*, *supra*, 8 Cal.4th at p. 566, fn. 3.) Nor does this case involve a safety device that failed to operate when it was supposed to, like the airbag in *McCabe*, *supra*, 100 Cal.App.4th at page 1125, or the asbestos-containing product that exposed consumers to a fatal disease "in the normal course of its intended use" in *Sparks*, *supra*, 32 Cal.App.4th at page 475. Finally, Harcourt has not asserted that the Model X is defective because it lacks a safety feature within the common experience of lay jurors like the grab bar or pole that the plaintiff in *Campbell* contended the bus should have provided. (*Campbell*, *supra*, 32 Cal.3d at p. 125.)

Instead, this case involves a misuse and an unusual one at that. A key fob was left in a car with an open door, a toddler entered, and the child unexpectedly performed the multiple steps—pressing on the brake, shifting the car into gear while pressing on the brake, and then releasing the brake and depressing the accelerator pedal—needed to move the vehicle. As a consequence, this case does not involve a situation within the common experience of ordinary consumers. Nor is it a "res ipsa-like" case (*McCabe*, *supra*, 100 Cal.App.4th at p. 1125, fn. 7; *Pruitt*, *supra*, 72 Cal.App.4th at p. 1484) in which a violation of commonly accepted, minimum safety assumptions may be inferred from the mere fact of malfunction or failure.

To the contrary, it is unclear that ordinary consumers have minimum safety assumptions about how cars should protect against misuse by toddlers and other young

12

children. (Harcourt's counsel conceded at oral argument that the consumer expectations test would not apply if a young teenager had managed to start the Model X when the door was open and the key fob left in the car.) While it is foreseeable that children may be left unattended in or around vehicles, and that children may cause (and have caused) inadvertent vehicle rollaways, a toddler climbing into a car in which the door was open and a key was left inside and then starting the car is not a common situation. As a consequence, it is not clear that ordinary consumers have any "commonly accepted minimum safety assumptions" about the safety measures that a car should have to deal with this situation. (*Soule*, *supra*, 8 Cal.4th at p. 569.) In addition, as Harcourt acknowledged, the Tesla Model X is "not a normal car," and it has many safety features—such as PIN-to-Drive—that most cars do not. Thus, even if ordinary consumers had minimum safety assumptions about how ordinary cars should deal with the toddler misuse in this case, it is not clear that those assumptions would apply to this car.

Harcourt has not offered any persuasive reason to conclude that ordinary consumers share any minimum safety assumptions about the misuse of cars by toddlers and other small children, much less the misuse here. Harcourt asserts that "Tesla's Model X lacked a common safety feature that the general public expects," but she fails to clearly identify that feature, much less explain why ordinary consumers expect it. (Cf. *Campbell*, *supra*, 32 Cal.3d at p. 127 [where a product is within the common experience of ordinary consumers, a plaintiff may establish a prima facie case under the reasonable expectations test by presenting evidence of, among the things, the "objective features of the product which are relevant to an evaluation of its safety"].) Harcourt cites her testimony at trial that, in her experience, to start a car "normally you would have to . . . to put your foot on the brake[]" and "press the [start] button." However, as Harcourt acknowledged at oral argument, she did not testify that she understood this feature to be a

13

safety measure. Nor does she explain why ordinary consumers would understand the feature to be a safety measure.

Instead, Harcourt asserts that "American consumers have . . . a reasonable expectation that two-year-old children will not be able to inadvertently operate ordinary passenger vehicles." That may be true. However, it does not follow that the consumer expectations test applies here. "[T]he consumer expectations test does not apply merely because the consumer states that he or she did not expect to be injured by the product." (*Trejo*, *supra*, 13 Cal.App.5th at p. 159.) In most, if not all, cases in which a consumer is injured by a product, the injury is unexpected; as a consequence, if an unexpected injury or occurrence alone were enough, "the consumer expectation test always would apply and every product would be found to have a design defect." (*Id*. at p. 159.) Far from suggesting this, the Supreme Court stated that the consumer expectations test applies only in cases "in which the *everyday experience* of the product's users permits a conclusion that the product's design violated *minimum* safety assumptions." (*Soule*, *supra*, 8 Cal.4th at p. 567; see also *id*. at p. 568 ["Unless the facts actually permit an inference that the product's performance did not meet the minimum safety expectations of its ordinary users, the jury must engage in the balancing of risks and benefits required by the second prong of *Barker*."].) Harcourt has not persuaded us that the everyday experience of consumes creates any safety assumptions concerning the sort of misuse involved in this case.

We therefore conclude that the consumer expectations test does not apply here, and because Harcourt chose not to assert a defect on any alternative ground, judgment was properly entered on her strict liability claim.

### III. DISPOSITION

The judgment is affirmed. In the interests of justice, the parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(5).)

14

 

_____

BROMBERG, J.

WE CONCUR:

_____

GREENWOOD, P. J.

_____

DANNER, J.

*Harcourt v. Tesla, Inc.*
H052308

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| MALLORY HARCOURT,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>TESLA, INC.,<br><br>    Defendant and Respondent. | H052308<br>(Santa Clara County<br>Super. Ct. No. 19CV358488)<br><br>ORDER MODIFYING OPINION<br>AND GRANTING REQUEST FOR<br>PUBLICATION<br>(NO CHANGE IN JUDGMENT) |

BY THE COURT:

It is ordered that the opinion filed herein on March 4, 2026, be modified as follows:

On page 11, second sentence of the first full paragraph, the word "the" is to be inserted between the words "has" and "burden" so that the sentence reads:

"Under this test, the plaintiff has the burden of demonstrating that a product's design proximately caused the plaintiff's injury."

There is no change in the judgment.

The opinion in the above-entitle matter filed on March 4, 2026, was not certified for publication in the Official Reports. The court has received requests for publication under California Rules of Court, rule 8.1120(a) from Horvitz & Levy, LLP and from the Product Liability Advisory Council, Inc. ("PLAC"). After reviewing the requests, it appears the opinion meets the standards for publication under California Rules of Court,

rule 8.1105(c).  The court therefore orders that the opinion be published in the Official Reports.

_____
BROMBERG, J.

_____
GREENWOOD, P. J.

_____
DANNER, J.

*Harcourt v. Tesla, Inc.*
H052308

Trial Court:                                      Santa Clara County Superior Court
                                                  Superior Court No. 19CV358488


Trial Judge:                                      The Honorable Daniel T. Nishigaya




Attorneys for Plaintiff and Appellants            Arias Sanguinetti Wang & Team LLP
Mallory Harcourt:                                 Elise M. Sanguinetti
                                                  Jamie G. Goldstein
                                                  Matthew J. Kita




Attorneys for Defendant and Respondent            Gibson Dunn & Crutcher LLP
Tesla, Inc.:                                      Theodore Joseph Boutros, Jr.



                                                  Dykema Gossett LLP
                                                  James M. Golden



                                                  Nelson Mullins Riley & Scarborough
                                                  Sandra G. Ezell

*Harcourt v. Tesla, Inc.*
H052308