Filed 4/16/14  Hellam v. Crane CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| JAMES HELLAM,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>CRANE CO.,<br><br>        Defendant and Appellant. | A138013, A139141<br><br>(Alameda County<br>Super. Ct. No. RG11609947) |

Plaintiff James Hellam developed mesothelioma decades after he was exposed to products of Crane Co. that contained asbestos.  A jury found Crane strictly liable for Hellam's injury.  In these consolidated appeals, Crane contends:  (1) insufficient evidence was presented that its products had a design defect; (2) insufficient evidence was presented that its products were a "substantial factor" in causing Hellam's mesothelioma; (3) the judgment improperly failed to apply settlement credits and was not final; and (4) Hellam was improperly awarded certain costs in a postjudgment order.  We conclude that the issues involving settlement credits are moot and affirm the judgment.  We also affirm the order awarding costs, except we remand to the trial court the limited issue whether costs for pretrial transcripts should be taxed.

I.

FACTUAL AND PROCEDURAL
BACKGROUND

Hellam was diagnosed with malignant mesothelioma at the age of 64. Mesothelioma is a fatal cancer that affects the pleura (lining) of the lungs.  At the time of trial in late 2012, Hellam was estimated to have no more than 18 months to live.

Hellam was born in 1946. When he was an adolescent, he lived with his maternal grandparents. From 1962 to 1966, years in which he attended high school and college, he worked full-time during the summers for his grandfather, Harvey Waugh, at Waugh's boiler business in Monterey, Monterey Boiler Service (MBS).

Hellam claimed to have been exposed to Crane's asbestos-containing products primarily when he worked at MBS. The main business at the shop was to refurbish boilers. The refurbishing process involved the application of an insulating material that Hellam and his grandfather referred to as "asbestos." The process also required the fabrication of gaskets, which were used to create a seal between pipe flanges.

Hellam recalled that the insulating material came packaged in bags marked in large print with the word "asbestos." Whenever MBS ran out of the bags, Hellam would accompany Waugh to Salinas to purchase more of them. One of the two suppliers where Hellam's grandfather bought the bags was Crane Supply, a Crane supply house. Hellam recalled that about half of the insulating cement his grandfather bought came from Crane Supply. At trial, a Crane corporate representative admitted that the company sold insulating cement that contained asbestos.

Hellam's grandfather also purchased sheet gasketing at Crane Supply. Hellam recalled that the sheets were grayish-white squares and had the word "Cranite" written diagonally across them. Crane's corporate representative testified that Cranite was trademarked by the company and contained 75 percent to 85 percent asbestos throughout the time it was sold.

Refurbishing a boiler required one to two bags of insulating cement. Hellam would retrieve a bag of cement from the storeroom and open it. He would then empty it into a trough, sending "[q]uite a bit" of dust into the air and onto him. After he added water and mixed, he and Waugh would apply the resulting "mud" to the boiler. Hellam was responsible for cleaning up by chipping away the mud that had hardened onto the trough. He also rolled up the empty cement bags to dispose of them, which released visible dust. Hellam estimated that the process of mixing and applying the cement to each boiler took 15 to 20 minutes and that MBS refurbished 12 to 15 boilers per summer.

Philip John Templin, an industrial hygienist, testified that each time Hellam worked with the bags of cement, he was exposed to asbestos that "ended up in his respiratory system." Templin estimated that when Hellam poured out the cement and mixed it, his asbestos exposure ranged from 10 to 100 fibers per cubic centimeter (f/cc). Such levels are, "[b]y a vast margin," greater than ambient asbestos-exposure levels, which range from 0.00000001 to 0.0001 f/cc. Templin testified that one 15-minute exposure at 50 f/cc would be equal to twice the exposure Hellam experienced "from ambient sources throughout his 64-year lifetime to the point of his diagnosis."

In addition to working with the cement, Hellam was responsible for making gaskets from sheet gasketing, including Cranite. This process involved using a hammer to tap an outline of each gasket and cutting it out, during which Hellam saw "particles" of the material "fly up" into the air. Hellam estimated that each gasket took between 10 and 20 minutes to make and that he made "[w]ell over a hundred" gaskets over the five summers he worked at MBS. Templin estimated that each of these occurrences would have exposed Hellam to between 0.2 and 5.0 f/cc of asbestos, a level "[s]ubstantially" above ambient asbestos-exposure levels.

Hellam indicated that during the time he worked at MBS he never believed that the cement or gasketing "were in any way hazardous to [his] health" or "were anything more than a nuisance dust." He testified that he did not wear "any respiratory protection" when mixing the cement, and no evidence was presented that he took any other safety precautions when handling products containing asbestos.

Hellam presented two experts who testified that his exposure to asbestos at MBS caused his mesothelioma. Barry Horn, M.D., testified that "[t]he only known cause of mesothelioma in the United States is prior exposure to asbestos." Dr. Horn testified that it "requires remarkably little exposure to asbestos" to put one "at significant risk" of developing mesothelioma. He also testified that "[t]here is unequivocally a dose-dependent relationship" between asbestos and mesothelioma, which means that the more asbestos one is exposed to, the higher one's risk of developing the disease. Dr. Horn

opined that as a result, "[e]very exposure [to asbestos] that [Hellam] had" while working at MBS "increased his risk" of developing mesothelioma.

Allan Smith, M.D., Ph.D., testified that the "only established major cause" of mesothelioma "is inhaling asbestos dust." He agreed that Hellam's exposure to asbestos at MBS "increased the risk that caused [his] cancer" and that each of Hellam's individual exposures at MBS contributed to that risk.

Hellam sued numerous defendants, but by the time of trial Crane was the only defendant still actively litigating the case. The jury considered four of Hellam's claims: strict liability (design defect), strict liability (failure to warn), negligence, and punitive damages. It returned a special verdict in favor of Hellam on the design-defect claim and in favor of Crane on the remaining claims, and awarded Hellam $937,882.56 in economic damages and $4.5 million in noneconomic damages. It allocated 7 percent of the fault to Crane, 75 percent to MBS, and the remaining 18 percent to three other named parties and "All Others."

The trial court entered judgment against Crane in December 2012. The judgment required Crane to pay the full $937,882.56 in economic damages, although the court noted that the figure "may be adjusted following the Court's determination of a motion for allocation of settlement credits." The court also reduced the noneconomic damages to $315,000 to reflect Crane's proportionate liability and reserved issuing a ruling on costs.

Crane moved to vacate the judgment, arguing that it was "premature and incomplete" because it did not account for settlement credits. It also moved for judgment notwithstanding the verdict. Both motions were denied in January 2013. Crane timely appealed from the judgment, the orders denying those motions, and various orders involving settlement credits.

The trial court subsequently considered costs. Hellam sought approximately $101,000 in costs, and Crane moved to tax several items. In May 2013, the court taxed $16,000 of the costs and awarded Hellam approximately $85,000. Crane timely appealed this order.

4

This court consolidated the two appeals on Crane's motion and granted Hellam's motion for calendar preference.

## II.
### DISCUSSION

A. *Substantial Evidence Supports the Jury's Determination that Crane's Products Had a Design Defect and Were Not as Safe as Ordinary Consumers Expected.*

Crane argues that it was entitled to judgment notwithstanding the verdict because there was insufficient evidence of a design defect or the elements of liability under the "consumer expectations" test. We disagree.

We review the denial of a motion for judgment notwithstanding the verdict "to determine whether substantial evidence supports the jury verdict." (*Shoyoye v. County of Los Angeles* (2012) 203 Cal.App.4th 947, 954.) In doing so, " '[w]e review the evidence in the light most favorable to the respondent, resolve all evidentiary conflicts in favor of the prevailing party[,] and indulge all reasonable inferences possible to uphold the jury's verdict. [Citation.]' " (*Ibid.*) We review de novo any issues involving the application of law to undisputed facts. (See *id.* at pp. 954-955.)

1.    Hellam introduced sufficient evidence of a design defect.

The general test of strict liability for a product with a defective design is well established. "A manufacturer, distributor, or retailer is liable in tort if a defect in the manufacture or design of its product causes injury while the product is being used in a reasonably foreseeable way." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 560.) Crane argues that the verdict on the design-defect claim cannot be sustained because the jury imposed "absolute liability" for "the mere presence of asbestos in the products at issue." It argues that the verdict on the design-defect claim was only supported by evidence that its products lacked warnings. According to Crane, this evidence cannot sustain the design-defect claim because the jury specifically rejected the failure-to-warn claim.

We disagree that the only evidence presented of a design defect in the products was that they lacked warnings. Evidence was also presented that, as Hellam argues, the

5

products had a "propensity to emit toxic asbestos fibers during ordinary use."  Hellam testified that in the ordinary course of mixing cement and cutting gaskets, the products released visible dust, and Templin testified that Hellam would have inhaled asbestos fibers as a result of these activities.  This constitutes evidence of a design defect.  (See *Jones v. John Crane, Inc.* (2005) 132 Cal.App.4th 990, 1002 (*Jones*) [design defect of asbestos products was their " 'emission of highly toxic, respirable fibers in the normal course of [their] intended use and maintenance' "]; *Sparks v. Owens-Illinois, Inc.* (1995) 32 Cal.App.4th 461, 475-476 (*Sparks*) [same].)

Crane does not challenge this evidence.  Instead, without attempting to distinguish *Jones*, *supra*, 132 Cal.App.4th 990 or *Sparks*, *supra*, 32 Cal.App.4th 461, it claims that characterizing the defect as the products' propensity to emit asbestos fibers, rather than the products' asbestos content, is a "distinction . . . without a difference."  Crane argues that "any product that is comprised of other materials can, under some set of circumstances, release those component materials unless said materials are chemically bound together."  But the evidence presented was not that asbestos could be released from Crane's products under some unusual or hypothetical set of circumstances.  Hellam presented evidence that asbestos fibers were *routinely* emitted in the course of mixing insulating cement and cutting gaskets.  Thus, we conclude that sufficient evidence of a design defect was presented.

2.     Hellam's testimony was sufficient evidence of the expectations of ordinary consumers.

Crane also argues that Hellam presented insufficient evidence to satisfy the consumer expectations test for proving a design-defect claim.  We disagree.

Strict liability for a design defect may be established by meeting one of two alternative tests:  "(1) the consumer expectations test, which asks whether the product performed as safely as an ordinary consumer would expect when used in an intended and reasonably foreseeable manner; or (2) the risk/benefit test, which asks whether the benefits of the challenged design outweigh the risk of danger inherent in the design." (*Bailey v. Safeway, Inc.* (2011) 199 Cal.App.4th 206, 214, citing *Anderson v. Owens-*

*Corning Fiberglas Corp.* (1991) 53 Cal.3d 987, 995; *Barker v. Lull Engineering Co.* (1978) 20 Cal.3d 413, 432.) At trial, Hellam proceeded under the consumer expectations test.

The consumer expectations test applies where "the ordinary users or consumers of a product . . . have reasonable, widely accepted minimum expectations about the circumstances under which it should perform safely" which "permit an inference that the product did not perform as safely as it should" because of a design defect. (*Soule v. General Motors Corp.*, *supra*, 8 Cal.4th at p. 566.) This test "is not necessarily foreclosed simply because the product at issue is only in specialized use, so that the general public may not be familiar with its safety characteristics," and a plaintiff may still prevail by introducing evidence that "the safe performance of the product fell below the reasonable, widely shared minimum expectations of those who *do* use it." (*Id.* at pp. 567-568, fn. 4, italics in original.) " 'The critical question, in assessing the [test's] applicability . . ., is not whether the product, when considered in isolation, is beyond the ordinary knowledge of the consumer, but whether the product, in the context of the facts and circumstances of its failure, is one about which the ordinary consumers can form minimum safety expectations.' " (*Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th 1298, 1311-1312, italics omitted.)

The test is routinely applied in asbestos cases (see, e.g., *Saller v. Crown Cork & Seal Co., Inc.* (2010) 187 Cal.App.4th 1220, 1236 (*Saller*); *Jones*, *supra*, 132 Cal.App.4th at p. 1002; *Sparks*, *supra*, 32 Cal.App.4th at pp. 475-476), and Crane does not contend otherwise. Instead, it argues that the test was inapplicable here because Hellam's testimony alone was insufficient to establish the expectations of "plumbing and heating contractors working in the boiler repair industry," since he was a self-described " 'gofer' who 'didn't know . . . much about that business.' "

We reject the argument that an ordinary consumer is defined so narrowly. In *Jones*, the Court of Appeal determined that the jury reasonably could have inferred that asbestos "products did not meet the ' "minimum safety assumptions of its ordinary consumers" ' " because sufficient evidence supported the finding "that *those working*

7

*with* [*the*] *defendant's products* did not expect to develop lung cancer from simply breathing the dust created in the ordinary use of the product." (*Jones*, *supra*, 132 Cal.App.4th at p. 1003, italics added.) In *Saller*, the Court of Appeal held there was sufficient evidence to justify a jury instruction on the consumer expectations test based on the plaintiff's "testimony concerning his expectations about [asbestos's] safety in its ordinary use at" his workplace where the plaintiff did not even work with the product at issue. (*Saller*, *supra*, 187 Cal.App.4th at pp. 1226-1227, 1236.) Hellam's testimony that he did not believe that the products or their dust posed any health risk was sufficient to establish the safety expectations of ordinary consumers because Hellam routinely used the products in the course of his work.

Moreover, even if Crane were correct that Hellam was required to present evidence about a boiler professional's expectations, his testimony permitted the inference that the products failed to meet Waugh's safety expectations. Hellam testified that his grandfather required him to take safety precautions during other activities, such as sandblasting, but did not instruct him to take any precautions with any asbestos products. The jury could have relied on this evidence to conclude that the products did not perform as safely as ordinary consumers expected.

Crane also argues that Hellam did not introduce sufficient evidence of "the objective features" of the products "from which the jury could determine whether [the products' design] satisfied minimum safety expectations," because the evidence showed at best that the products' use "caused a release of respirable asbestos fibers" that did not exceed the "generally recognized safe level" of asbestos exposure in the 1960's. But the argument that the consumer expectations test applies only if the dangers of the product are understood at the time the product is used has been rejected. In *Saller*, the Court of Appeal rejected an argument that the consumer expectations test "does not apply to asbestos products in use in the 1950's and 1960's because no one knew of the dangers of asbestos at that time." (*Saller*, *supra*, 187 Cal.App.4th at p. 1236.) The court pointed out that "[i]f knowledge of the hazardous nature of the product were a prerequisite for the test to apply, then no product would ever fail to meet the safety expectations of the reasonable

8

consumer." (*Ibid.*)  The relevant issue is whether ordinary consumers at the time expected that breathing dust caused by the intended and foreseeable use of the asbestos products would cause a fatal disease, not whether a plaintiff's exposure to the dust exceeded the level then believed safe.  (See *Jones*, *supra*, 132 Cal.App.4th at p. 1003; *Sparks*, *supra*, 32 Cal.App.4th at p. 475.)  Hellam presented sufficient evidence that he "could reasonably expect, and had every right to expect, that use of the product[s] would not lead to a . . . fatal . . . illness." (*West v. Johnson & Johnson Products, Inc.* (1985) 174 Cal.App.3d 831, 867.)

> B.    *Hellam Introduced Sufficient Evidence that the Products Were a Substantial Factor in Causing His Mesothelioma.*

Crane contends that there was insufficient evidence that its products were a "substantial factor" in causing Hellam's mesothelioma as required under *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 968.  We disagree.

A plaintiff in an asbestos product-liability action "must first establish some threshold exposure to the defendant's defective asbestos-containing products, and must further establish in reasonable medical probability that a particular exposure or series of exposures was a 'legal cause' of his injury, i.e., a substantial factor in bringing about the injury." (*Rutherford v. Owens Illinois, Inc.*, *supra*, 16 Cal.4th at pp. 969, 982, italics & fn. omitted.)  "The substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical." (*Id.* at p. 978.)  Under *Rutherford*, " 'a force which plays only an "infinitesimal" or "theoretical" part in bringing about injury . . . is not a substantial factor' [citation], but a very minor force that does cause harm is a substantial factor [citation]." (*Bockrath v. Aldrich Chemical Co.* (1999) 21 Cal.4th 71, 79.)  Where the injury at issue is cancer caused by asbestos, "the plaintiff need not prove that fibers from the defendant's product were the ones, or among the ones, that actually began the process of malignant cellular growth.  Instead, the plaintiff may meet the burden of proving that exposure to [the] defendant's product was a substantial factor causing the illness by showing that in

9

reasonable medical probability it was a substantial factor contributing to the plaintiff's or decedent's risk of developing cancer." (*Rutherford*, at pp. 982-983, italics omitted.)

"Many factors are relevant in assessing the medical probability that an exposure contributed to [a] plaintiff's asbestos disease. Frequency of exposure, regularity of exposure, and proximity of the asbestos product to [the] plaintiff are certainly relevant . . . . Additional factors may also be significant in individual cases, such as the type of asbestos product to which [the] plaintiff was exposed, the type of injury suffered by [the] plaintiff, and other possible sources of [the] plaintiff's injury. [Citations.] 'Ultimately, the sufficiency of the evidence of causation will depend on the unique circumstances of each case.' [Citation.]" (*Lineaweaver v. Plant Insulation Co.* (1995) 31 Cal.App.4th 1409, 1416-1417.)

Here, Hellam presented sufficient evidence of causation. Multiple witnesses testified that Hellam's exposure to asbestos at MBS caused his mesothelioma. Hellam testified about his many direct exposures to bags of cement and sheet gasketing obtained from Crane Supply, and Templin testified that such exposures were at levels greatly exceeding ambient levels of asbestos. Drs. Horn and Smith testified that each exposure increased Hellam's risk of developing mesothelioma. Taken together, this evidence was sufficient to establish to a reasonable medical probability that the products at issue were a substantial factor contributing to Hellam's risk of developing mesothelioma.

Crane argues that Dr. Horn's testimony was insufficient evidence of causation because it "improperly equated" exposure with causation. Crane characterizes Dr. Horn's testimony as being "that every exposure, no matter how great or small, was a 'substantial factor' in causing disease." Dr. Horn's actual testimony, however, was that "[e]very exposure that [Hellam] had" *during his work history at MBS* "increased his risk." As Templin's testimony established, those exposures were at levels significantly greater than ambient levels. Moreover, Hellam's testimony established that he was exposed to the products dozens of times over his employment at MBS. As a result, the jury could reasonably conclude based on Dr. Horn's testimony that the products were a substantial factor in increasing Hellam's risk of developing mesothelioma.

10

Crane also argues that Dr. Smith's testimony was insufficient evidence of causation because it did not differentiate between Crane's products and those of other companies. Dr. Smith's testimony about causation was based on a hypothetical about Hellam's work with (1) "bags of material that said 'asbestos' on the outside of the bag" that came from Crane Supply or the other Salinas supplier and (2) "sheet gasket material . . . made of 70 to 85 percent asbestos." Crane takes issue with the mention of the other supplier, but Dr. Smith's testimony was sufficiently tied to products obtained from Crane Supply: Hellam testified that about half of the bags of cement he used came from there, and the hypothetical's description of sheet gasketing matched the characteristics of Cranite, a product he also used. The jury could have reasonably concluded that the hypothetical described Crane's products, and it could have inferred, based on Dr. Smith's testimony, that those products sufficiently contributed to Hellam's risk of developing mesothelioma.

C.     *The Judgment Does Not Violate the One Final Judgment Rule.*

Crane argues that the trial court erred by not applying settlement credits in the judgment,[1] thereby violating the "one final judgment rule." We again disagree.

Under the one final judgment rule, " ' "there can be but one judgment in an action no matter how many counts the complaint contains." ' " (*Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 738.) Subject to certain exceptions not relevant here, a party may appeal "[f]rom a judgment, except . . . an interlocutory judgment" (Code Civ. Proc., § 904.1, subd. (a))[2], that is, "a judgment that is not intermediate or nonfinal but is the one final judgment." (*Morehart*, at p. 741.) "Judgments that leave nothing to be

---

[1] Crane raises several other claims involving settlement credits but stated in its opening brief and at oral argument that these claims need not be decided now because the trial court has since entered an amended judgment applying credits. We will consider any settlement-credit issues Crane wishes to raise if and when it perfects an appeal from the amended judgment.

[2] All further statutory references are to the Code of Civil Procedure unless otherwise noted.

11

decided between one or more parties and their adversaries, or that can be amended to encompass all controverted issues, have the finality required by section 904.1, subdivision (a)." (*Ibid.*)

Crane's argument is foreclosed by *Cadlo v. Metalclad Insulation Corp.* (2007) 151 Cal.App.4th 1311, which held that a judgment can be final and appealable even if settlement credits have not yet been applied. (*Id.* at p. 1323.) Crane does not address this decision. Instead, it relies primarily on *Kinoshita v. Horio* (1986) 186 Cal.App.3d 959, 966 in making the point that "this consolidated appeal has required '[p]iecemeal disposition and multiple appeals' which the one final judgment rule is designed to prevent." But however accurate this general policy statement may be, it does not establish that there can be only one appealable order per action or that a judgment is not appealable if it might be amended later. We conclude that the December 2012 judgment entered by the trial court was a final judgment.

### D. The Trial Court Did Not Improperly Award Certain Costs, but Remand Is Necessary for a Limited Purpose.

Finally, Crane argues that the trial court erred by not taxing (1) costs Hellam incurred in pursuing litigation against other defendants; (2) costs to prepare "computer illustrations" used at trial; and (3) "statutorily prohibited trial transcript costs." We conclude that these costs were properly awarded, except that we remand for the trial court to consider in the first instance whether Hellam is entitled to recover his costs for transcripts of pretrial proceedings.

Hellam sought $101,092.40 in costs. This sum included approximately $2,035 in filing and motion fees, $39,127.01 in deposition costs, $9,641.90 for costs to serve process, and $140 in witness fees, all of which Crane contends should be reduced to account for other defendants; $12,234.67 of costs for "[m]odels, blowups, and photocopies of exhibits"; and $33,436.70 of costs for "[c]ourt reporter fees as established by statute." The trial court granted in part Crane's motion to tax costs, subtracted $16,000 to account for "daily transcript fees" that the court determined were not recoverable, and awarded Hellam the remaining $85,092.40.

12

" '[I]f the items [in a memorandum of costs] appear to be proper charges[,] the verified memorandum is prima facie evidence that the costs . . . therein listed were necessarily incurred . . ., and the burden of showing that an item is not properly chargeable or is unreasonable is upon the [objecting party].' [Citations.]" (*Nelson v. Anderson* (1999) 72 Cal.App.4th 111, 131 (*Nelson*).) In contrast, if a party objects to costs whose " 'necessity . . . appears doubtful, or which do[] not appear to be proper on [their] face,' " then " 'they are put in issue and the burden of proof is on the party claiming them as costs.' " (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 856.)

We review an award of costs for an abuse of discretion, including the trial court's resolution of the question of fact "[w]hether a cost is 'reasonably necessary to the conduct of the litigation.' " (*Gibson v. Bobroff* (1996) 49 Cal.App.4th 1202, 1209.) Any associated questions of statutory interpretation are reviewed de novo. (*Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1332.) With these standards in mind, we turn to Crane's specific objections.

### 1. The trial court did not abuse its discretion by refusing to allocate costs to account for other defendants.

Crane argues that the trial court erred by not taxing costs Hellam incurred in pursuing litigation against other defendants. It claims that costs for motions, depositions, service fees, and witness fees related to other defendants were "not integrally associated with [Hellam's] claims against Crane Co." and were therefore not "reasonably necessary" to pursuit of those claims.[3] We reject this argument.

The right to recover costs in a civil action " 'is determined entirely by statute.' " (*Anthony v. City of Los Angeles* (2008) 166 Cal.App.4th 1011, 1014.) "Except as otherwise expressly provided by statute, a prevailing party is entitled as a matter of right

---

[3] In making this argument, Crane states in passing that the trial court erred by awarding Hellam costs for filing and motion fees Crane previously paid. We do not consider whether the court improperly awarded costs Hellam had already recovered because Crane does not seek relief on this basis.

13

to recover costs in any action or proceeding." (§ 1032, subd. (b); *Smock v. State of California* (2006) 138 Cal.App.4th 883, 889.) "This means that the prevailing party is entitled to all of his costs unless another statute provides otherwise. [Citation.] Absent such statutory authority, the [trial] court has no discretion to deny costs to the prevailing party." (*Nelson*, *supra*, 72 Cal.App.4th at p. 129.)

One statute that limits the recovery of costs requires costs to "be reasonably necessary to the conduct of the litigation rather than merely convenient or beneficial to its preparation" and "reasonable in amount." (§ 1033.5, subd. (c)(2), (3).) Because costs must be reasonably necessary and reasonable in amount, "a prevailing party is [not] always entitled to 100 percent of its costs . . . or . . . to a double or greater recovery when there are two or more [opposing parties]." (*Nelson*, *supra*, 72 Cal.App.4th at p. 130; see also *Perko's Enterprises, Inc. v. RRNS Enterprises* (1992) 4 Cal.App.4th 238, 242-245 [trial court may tax costs specifically permitted under section 1033.5, subdivision (a) if they are not reasonably necessary].)

Here, the trial court recognized that costs must be both reasonably necessary and reasonable in amount, but it declined to prorate the costs awarded to account for other defendants. In doing so, it observed that Crane was the only defendant remaining at trial and indicated its concern that apportionment could deny Hellam costs to which he was entitled.

Crane contends that under *Heppler v. J.M. Peters Co.* (1999) 73 Cal.App.4th 1265 (*Heppler*), the trial court was precluded from awarding Hellam any costs "not integrally associated with his claims against Crane Co." *Heppler* involved construction-defect claims against subcontractors who were responsible for separate jobs on a residential development. (*Id.* at pp. 1271-1272.) The plaintiffs prevailed at trial against only one of the subcontractors, and the trial court ordered him to pay costs under section 1032. (*Heppler,* at pp. 1272, 1298.) The losing subcontractor contended that the trial court had abused its discretion by requiring him to pay more than his pro rata share of certain trial-related cost items. (*Id.* at p. 1298.) The Court of Appeal agreed and reversed the award of costs. (*Id.* at pp. 1298-1299.)

14

*Heppler*, *supra*, 73 Cal.App.4th 1265 is unpersuasive, however, because the Court of Appeal did not rely on section 1033.5 or any other relevant statutory authority. Instead, the court rested on the reasoning it used earlier in the decision to determine that apportionment was required as to an attorney fees award under Civil Code section 1717, subdivision (a). (*Heppler*, at pp. 1296-1297.) Moreover, *Heppler* is factually distinguishable. The subcontractors in that case were responsible for different work on the development, and some portions of the trial involved issues that were clearly unrelated to the work done by the losing subcontractor. As a result, "some of [the issues] could have been severed and isolated" for allocation purposes. (*Id.* at p. 1297.) In contrast, Hellam's mesothelioma was a single injury caused by his cumulative exposure to asbestos, making separation of issues by defendant here far more difficult, if not impossible. We conclude that the trial court did not abuse its discretion by refusing to allocate costs to account for other defendants.

> 2. The trial court did not abuse its discretion in awarding costs for "computer illustrations."

Crane also argues that the trial court improperly granted Hellam costs for time spent on "computer illustrations." Again, we disagree.

Hellam sought $12,234.67 in costs for "[m]odels, blowups, and photocopies of exhibits," including "[c]omputer illustrations." In his opposition to Crane's motion to tax costs, he explained that the claimed costs in this category were for (1) "blowups, digital photos, digital presentations[,] and exhibits," including costs for "digital presentations and color enlargements mounted on foam to help the jury understand the lay[]out of [his] workplaces, as well as how boilers and their component parts work and how workers like [him] worked with them"; and (2) the enlargement of "segments of depositions . . ., jury instructions, the verdict form, and [his] family photos." Hellam also submitted receipts showing, among other costs, $5,167.50 billed for 26.5 hours spent on "[c]omputer illustration for opening slides" and $3,900 billed for 20 hours spent on "[c]omputer illustration on 11/12 . . . [¶] . . . [¶] . . . 11/13[,] . . . [¶] . . . [¶] . . . [and] 11/14" (all dates during the trial), a total of $9,067.50 plus tax. The trial court did not tax the costs sought,

15

reasoning that they were "reasonably and necessarily incurred within this inherently complex litigation process[.]"

Costs for "[m]odels and blowups of exhibits and photocopies of exhibits" may be awarded "if they were reasonably helpful to aid the trier of fact" (§ 1033.5, subd. (a)(13)), implicitly requiring that the materials were actually used at trial. (*Ladas v. California State Auto. Assn.* (1993) 19 Cal.App.4th 761, 775.) Section 1033.5, subdivision (a)(13) is applicable only to "exhibits," however. An award of costs for "computer illustrations" was therefore proper only if the illustrations were reasonably necessary to the litigation, not just helpful to the jury. (See *Seever v. Copley Press, Inc.* (2006) 141 Cal.App.4th 1550, 1558 [a cost item not expressly permitted or prohibited in section 1033.5 "may be awarded in the trial court's discretion . . . provided it satisfies the further requirement . . . that it was reasonably necessary to the conduct of the litigation"].)

Crane contends that Hellam did not sufficiently identify the computer illustrations and thus failed to carry his burden of showing that the costs to create them could be recovered. But the trial court was aware of the materials presented at trial, and Hellam's identification of them in the opposition to Crane's motion could have sufficiently enabled the court to identify the illustrations for which Hellam sought costs. (See *Heppler*, *supra*, 73 Cal.App.4th at p. 1298.) In determining that the costs sought were reasonably necessary to the conduct of the litigation, the court applied the correct standard governing the recoverability of costs for items not specifically listed in section 1033.5. Accordingly, the court did not abuse its discretion by awarding these costs.

### 3. Remand is necessary for the trial court to consider whether costs for transcripts of pretrial proceedings should be awarded.

Finally, Crane argues that the trial court erred by not taxing all of the costs attributable to transcripts. On this point, we conclude that the record is unclear, and we therefore remand for the trial court to consider in the first instance whether and to what extent costs for pretrial transcripts are recoverable.

Hellam's memorandum of costs sought $33,436.70 in costs for "[c]ourt reporter fees as established by statute." The memorandum listed 38 items under this category, each consisting only of the reporter's name and the claimed amount. In its motion to tax costs, Crane argued that Hellam had not provided sufficient information, including the dates or nature of the proceedings transcribed, to enable it to judge "the reasonableness and necessity of" those costs. Hellam then submitted receipts indicating that portions of the amounts billed to him were for transcripts, not just court reporter fees. Crane argued in reply that the receipts showed that Hellam was "attempt[ing] to recover costs associated with court proceeding transcripts[,] which are statutorily prohibited costs." (Italics omitted.)

The trial court found that Hellam was entitled to recover $7,000 in costs for the reporter fees at trial but taxed the claimed amount by $16,000, the amount the court estimated was billed for daily trial transcripts. The court's order does not mention, however, the costs for pretrial court reporter fees and pretrial transcripts sought by Hellam, which represent over $10,000 of the original amount claimed, and these costs were not taxed.

Hellam argues that Crane waived this claim because it never argued below that court reporter fees for transcription of pretrial proceedings were prohibited. But Crane's position is that the trial court improperly awarded costs for pretrial *transcripts*. (See *Chaaban v. Wet Seal, Inc.* (2012) 203 Cal.App.4th 49, 58 [costs for court reporter fees are "an entirely different expense" from those for transcripts].) Crane argued below that Hellam should not recover costs for *any* transcripts, and we therefore conclude that it has preserved this claim.

Section 1033.5, subdivision (b)(5) prohibits the recovery of costs for "[t]ranscripts of court proceedings not ordered by the court." The trial court held that the costs for daily trial transcripts were not recoverable and taxed the amount sought accordingly, but the order does not tax or otherwise mention costs for pretrial transcripts. We cannot be certain whether the court ordered any of the pretrial transcripts, which is determinative of whether such costs can be awarded. (See § 1033.5, subd. (b)(5).) Under these

17

circumstances, we find it appropriate to remand the issue to enable the trial court to determine in the first instance whether all such costs are recoverable and which additional amount, if any, should be taxed.

### III.
### DISPOSITION

The judgment, the order denying the motion for judgment notwithstanding the verdict, and the order denying the motion to vacate the judgment are all affirmed.  The order awarding costs is also affirmed, except that we remand with directions to consider whether and to what extent costs for pretrial transcripts should be taxed.  Hellam is awarded his costs in both appeals.

_____
Humes, J.

We concur:


_____
Ruvolo, P.J.


_____
Reardon, J.