Filed 4/13/21  LAOSD Asbestos Cases CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| LAOSD ASBESTOS CASES | B303627 |
| ARTHUR PUTT et al., | |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. 18STCV06912/JCCP4674) |
| v. | |
| FORD MOTOR COMPANY, | ORDER MODIFYING OPINION AND DENYING REHEARING |
| Defendant and Appellant. | NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on March 25, 2021, be modified as follows:

1. On page 13, bottom of the page and after the sentence "Taken together, this evidence compels a finding that "some nonzero percentage of fault is properly attributed" to the

other automakers and the brake pad manufacturers and suppliers" insert the following as a new footnote:

> Contrary to what plaintiff suggests for the first time in his petition for rehearing, our partial reliance on the jury's special verdict findings in assessing what the totality of the evidence compels regarding allocation is not an implicit determination that the jury returned inconsistent special verdicts. We are not citing those findings to show that they are somehow inconsistent with other findings by the jury. Instead, we are citing them because they reflect the facts the jury actually found, and it is those facts along with the other evidence we cite that compels a contrary allocation finding in this case.

\*       \*       \*

There is no change in the judgment.
Plaintiffs' petition for rehearing is denied.

_____

LUI, P. J.                CHAVEZ, J.                HOFFSTADT, J.

2

Filed 3/25/21  LAOSD Asbestos Cases CA2/2 (unmodified opinion)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| LAOSD ASBESTOS CASES | B303627 |
| ARTHUR PUTT et al., | |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. 18STCV06912/JCCP4674) |
| v. | |
| FORD MOTOR COMPANY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Stephen M. Moloney, Judge.  Reversed in part and remanded.

Simmons Hanly Conroy, Deborah R. Rosenthal and William A. Kohlburn; Law Office of Ted W. Pelletier and Ted W. Pelletier for Plaintiffs and Appellants.

Horvitz & Levy, Jason R. Litt and Emily V. Cuatto; Snell & Wilmer, Warren E. Platt and Alina Mooradian for Defendant and Appellant.

Fred J. Hiestand for The Civil Justice Association of California and the U.S. Chamber of Commerce as Amicus Curiae on behalf of Defendant and Appellant.

\* \* \* \* \* \*

A former gas station employee performed brake jobs in the 1960s and 1970s, at a time when all brake pads contained asbestos. He contracted mesothelioma, and sued several entities, including Ford Motor Company (Ford). Everyone but Ford settled. A jury awarded the employee and his spouse $8.5 million in compensatory damages, awarded the employee $25.5 million in punitive damages, and found that Ford was at fault for 100 percent of the employee's injuries. Because it was undisputed at trial that the brake pads manufactured by others were identical to those incorporated into Ford's vehicles, the jury's special verdict findings against Ford apply with equal force to the other automakers and brake pad manufacturers and suppliers, such that the jury's apportionment of 100 percent of fault to Ford is unsupported by the evidence. The trial court may have erred in instructing the jury regarding the possible liability of the employee's employers (that is, the gas station owners), but this error is not prejudicial. We accordingly leave intact the jury's finding of liability against Ford, its compensatory damages award, and its finding that punitive damages are appropriate, but reverse and remand the matter for a new trial on apportionment of fault among the automakers and brake pad manufacturers and suppliers as well as a new trial on the amount of punitive damages.

## FACTS AND PROCEDURAL BACKGROUND

### I.    Facts

#### A.    *Plaintiff was exposed to dust from brakes in the 1960s and 1970s*

Arthur Putt (plaintiff) worked at various gas stations in the 1960s and 1970s.  Between 1966 and 1970, he worked in California at stations owned by Exxon Mobil and Chevron Oil.  In 1975 and 1976, he worked in Indiana at stations owned by Standard Oil.

While so employed, plaintiff worked as an auto mechanic and regularly replaced the brake pads on vehicles.  He followed a specific process: (1) he removed the used brake pads from the brake drums; (2) he used an air compressor to blow out the debris that had accumulated in the drum from brake use; (3) he sanded down the new brake pads he planned to install to remove the glaze on them; and (4) he then installed the new brake pads.  He was exposed to dust from the used brakes when he blew out the debris and exposed to dust from the new brakes when he sanded them.

Plaintiff worked with brake pads supplied by various entities.

The used brake pads plaintiff removed came from cars manufactured by Ford, Chevrolet, or Dodge/Chrysler.  Plaintiff estimated that he replaced the brake pads on Ford vehicles approximately 40 percent of the time while he was working in California and approximately 30 percent of the time while he was working in Indiana.  Plaintiff also estimated that he performed the *first* brake pad replacement on those vehicles—that is, that he removed the factory-installed brake pads—approximately 40

3

percent of the time. Although Ford did not *itself* manufacture the brake pads installed on its new vehicles in factories and instead used brakes manufactured by third parties to Ford's specifications, Ford's incorporation of those brake pads into its new vehicles renders Ford liable for any defects with them. (E.g., *Arena v. Owens-Corning Fiberglas Corp.* (1998) 63 Cal.App.4th 1178, 1193-1194 (*Arena*) [entities "within the same chain of distribution of a single product" are jointly liable for injuries caused by that product].) Thus, approximately 16 percent—that is, 40 percent of 40 percent—of the brake pads plaintiff removed are attributable to Ford.

The new brake pads plaintiff installed all came from third party manufacturers, and never from Ford. Plaintiff said he bought replacement pads exclusively from NAPA or Pep Boys.

### B. *The brake pads contained asbestos*

In the 1960s and 1970s, all brake pads manufactured and used in the United States contained approximately 40 to 60 percent asbestos by weight. There are many types of asbestos. Brake pads of this vintage contained the type known as chrysotile: Most experts opine that chrysotile was the *only* type of asbestos in brake pads of this vintage, although a few opine that brake pads of this vintage also "occasionally" contained "low levels" of either amosite or tremolite, both of which are more potent forms of asbestos than chrysotile. However, it is undisputed that the *dust* generated from the brake pad replacement process contained only chrysotile.

Plaintiff was exposed to asbestos during two steps of the process for changing brake pads. First, he was exposed when he inhaled the dust generated by blowing out debris from the used brake pads, although asbestos accounted for less than 15

percent—and, as most experts opined, less than one percent—of the debris (because the driver's repeated use of the brakes converted the bulk of the asbestos into other, non-harmful compounds). Second, plaintiff was exposed when he inhaled the dust generated when he sanded the new brake pads.

### C. *Plaintiff contracts mesothelioma*

The inhalation of asbestos causes mesothelioma, a type of cancer of the lungs.

Mesothelioma is a "dose-response disease[]," which means "the more [a person is] exposed to [asbestos], the more likely [he is] to get" mesothelioma. This means that every exposure to asbestos "above background" is causally "meaningful" and "important" because every exposure "add[s] to the dose and increase[s] the risk" of contracting mesothelioma. This is true no matter which product gives rise to the asbestos fibers that are inhaled. As a result, *no* exposure is causally "insignificant" and "the causal contribution of" exposure to asbestos "dust" from any source cannot be "disregard[ed]" or "discounted."

Plaintiff was diagnosed with mesothelioma in 2018.

Mesothelioma is incurable, and hence fatal.

## II. Procedural Background

### A. *Complaint*

In December 2018, plaintiff and his wife sued Ford and 15 other entities he alleged were responsible for his exposure to asbestos, as pertinent here, under theories of (1) negligence, (2) strict products liability, and as to plaintiff's wife, (3) loss of consortium.[1]

---

1    Plaintiff also alleged claims for making false representations under Restatement of Torts, section 402-B; for intentional injury and deceit (Civ. Code, §§ 1708-1710); and for

All of the defendants but Ford settled prior to trial; those settlements came to a total of $2,280,000.

## B. *Trial against Ford*

The matter proceeded to a three-week jury trial against Ford alone.

The trial court instructed the jury that Ford could be liable to plaintiff and his wife under theories of (1) strict liability for (a) defectively designing a product that "did not perform as safely as an ordinary consumer would have expected," and (b) failing to warn of the "potential risks" of its product, and (2) negligence for (a) its product design, (b) its failure to warn, and (c) its failure to recall the product.

The court also instructed the jury that it had to "assign[] percentages of responsibility" to each nonparty "listed on the [special] verdict form" if Ford established that (1) any of those nonparties—namely, the gas stations for whom plaintiff worked "and/or [the] manufacturers or suppliers of asbestos-containing products"—"were [also] negligent or at fault" for plaintiff's injuries, and (2) their "negligence or fault was a substantial factor in causing [plaintiff's] harm." The special verdict form listed three groups of potentially responsible nonparties: (1)

aiding and abetting a battery. These claims were not presented to the jury in the trial against Ford.

The other 15 defendants were CBS Corporation; Certain-Teed Corporation; Crown Cork & Seal Company; Forest River, Inc.; Foster Wheeler Energy Corporation; General Electric Company; Genuine Parts Company; Industrial Holdings Corporation; Ingersoll-Rand Company; John Crane Inc.; Kelly Moore Paint Company, Inc.; The Pep Boys, Manny, Moe & Jack of California; Pneumo Abex LLC; Soco West, Inc.; and Union Carbide Corporation.

"[plaintiff's] employers (Standard Oil, Chevron and Exxon)," (2) "Other automakers (Chevrolet, Chrysler)," and (3) "Manufacturers or suppliers of replacement brakes (NAPA and Pep Boys, as sellers of Bendix, Pneumo Abex products)."

In its special verdict, the jury found Ford liable on every theory presented. As to strict liability for defective product design, the jury specially found that Ford's product did not "perform as safely as an ordinary consumer would have expected," that it was "used in a way that was reasonably foreseeable to Ford," and that "the failure of Ford['s] . . . product(s) to perform as safely as an ordinary consumer would have expected [was] a substantial factor in causing harm to" plaintiff.

With regard to damages, the jury awarded plaintiff $500,000 in economic damages, which was the amount to which plaintiff and Ford stipulated. The jury awarded plaintiff and his wife each $4 million in noneconomic damages. The jury also found that Ford had acted with malice, oppression, or fraud.

After a brief punitive damages phase, the jury returned a further verdict imposing $25.5 million in punitive damages on Ford.

The trial court entered judgment for plaintiff in the amount of $33,892,748.80, which included costs and incorporated a $107,251.20 offset from the settlements of the other parties.

C. *Posttrial motions*

Ford moved for a new trial and for judgment notwithstanding the verdict challenging the jury's apportionment of liability, the jury instructions, and the amount of punitive damages. After fulsome briefing, the trial court issued a tentative ruling that granted a new trial on the issues of

7

apportionment and punitive damages. After an hour-long hearing, the trial court issued a final ruling that upheld the jury's apportionment of liability and rejected Ford's claims of instructional error, but reduced the punitive damages award to $8,785,569.60.

In its final ruling, the trial court upheld the jury's apportionment of 100 percent fault to Ford for what boils down to three reasons: (1) Ford was required to prove "what percentage of fault should be attributable to each entity" listed on the special verdict form, but did not "prove [that] percentage" or "suggest[ it] to the jury" and thus left the jury to "speculate," (2) Ford did not call any witnesses or introduce any documentary evidence regarding the fault of the other entities, and (3) Ford did not offer any evidence regarding the "specific properties of the other entities' products which contained asbestos" or the extent of plaintiff's usage or exposure to those products, and instead relied upon the "'mere possibility of exposure . . . to establish causation.'" In reducing the punitive damages award, the court recounted the parties' various positions and then, without any further explication, declared that the jury's $25.5 million award was "excessive" and that "the appropriate multiplier is two-to-one."

## D. *Entry of judgment, appeal and cross-appeal*

After the trial court entered an amended judgment for plaintiff in the amount of $17,427,713.40, Ford filed a timely appeal and plaintiff filed a timely cross-appeal.

## DISCUSSION

In its appeal, Ford argues that the trial court erred in denying its new trial motion because (1) substantial evidence did not support the jury's apportionment of 100 percent of fault to

8

Ford, and (2) the court erred in refusing two of Ford's requested jury instructions; on the basis of these errors, Ford seeks a new trial on *all* issues.  In his cross-appeal, plaintiff argues that the trial court erred in reducing the jury's $25.5 million punitive damages award; he seeks reinstatement of that award.  As discussed below, we agree with Ford that the jury's special verdict findings, when read in conjunction with the record, compel a finding that Ford is not 100 percent at fault for plaintiff's injury and that the jury's contrary finding is not supported by substantial evidence.  This error, we explain, warrants a new trial on apportionment and the amount of punitive damages.  We also conclude that any error in the jury instructions regarding the liability of the gas station owners—as it bears on apportionment of liability to them—was not prejudicial.  These conclusions obviate the need to reach the merits of plaintiff's cross-appeal regarding punitive damages.

## I.    Motions for New Trial, Generally

As pertinent here, a trial court may grant a new trial when "the evidence" is "[i]nsufficien[t]" "to justify the verdict or other decision, or the verdict or other decision is against law."  (Code Civ. Proc., § 657, subd. (6).)

For purposes of a new trial motion, the evidence can be insufficient in one of two ways: (1) it can be "insufficient" "to justify the verdict" because the trial court, sitting as a thirteenth juror who independently weighs the evidence, would have come to a different result (*Mercer v. Perez* (1968) 68 Cal.2d 104, 112), or (2) it can be "against law" because the verdict is "unsupported by any substantial evidence" (*Sanchez-Corea v. Bank of America* (1985) 38 Cal.3d 892, 906-907).  Although Ford's motion for new trial argued the "thirteenth juror" type of insufficiency and the

9

trial court's tentative ruling granted a new trial on this same type, Ford's motion for new trial also argued that the jury's apportionment verdict was unsupported by substantial evidence because the evidence at trial "compelled" a different apportionment, the trial court's final ruling seemed to rest on this type, and this is the type of insufficiency argued by both parties in their briefs on appeal. (Accord, *Siry Investment, L.P. v. Farkhondehpour* (2020) 45 Cal.App.5th 1098, 1131-1132, fn. 11 [trial court's citation to incorrect statutory *ground* for new trial relief is of no moment where the *reason* it granted relief was raised by the movant], review granted July 8, 2020, S262081.) As a result, the substantial evidence type of insufficiency is properly before us.

A new trial may also be granted if the jury instructions are prejudicially incorrect. (Code Civ. Proc., § 657, subd. (7); *McCarty v. Department of Transportation* (2008) 164 Cal.App.4th 955, 984.)

We review the trial court's denial of a new trial motion for an abuse of discretion. (*Minnegren v. Nozar* (2016) 4 Cal.App.5th 500, 514, fn. 7.)

## II. Sufficiency of the Evidence Underlying the Jury's Apportionment Verdict

In actions for "personal injury," a defendant is "liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault." (Civ. Code, § 1431.2, subd. (a); *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 958 (*Rutherford*).) "[I]f supported by the evidence," a jury must apportion fault against parties and nonparties found responsible for the plaintiff's injury, and must do so regardless of whether they are at fault due to negligence or instead on a theory of strict liability. (*Arena, supra,*

10

63 Cal.App.4th at pp. 1194, 1198; *DaFonte v. Up-Right, Inc.* (1992) 2 Cal.4th 593, 603.) Apportionment is meant to "protect[] the defendant [who goes to trial] from paying more than its share of noneconomic damages." (*Arena*, at p. 1193.)

Once the plaintiff proves that the defendant is at fault for his injury, it becomes *the defendant's* burden to "establish[] that some nonzero percentage of fault is properly attributed to" others—whether they be "the plaintiff, other defendants, or nonparties to the action." (*Pfeifer v. John Crane, Inc.* (2013) 220 Cal.App.4th 1270, 1285 (*Pfeifer*); *CRST, Inc. v. Superior Court* (2017) 11 Cal.App.5th 1255, 1261, fn. 4.) Where, as here, the defendant is arguing that the jury's finding that *no* fault should be apportioned to others is unsupported by substantial evidence, the defendant will prevail on appeal only if it proves that the evidence—when viewed in the light most favorable to the jury's apportionment finding—nevertheless "compel[s] a finding" that "some nonzero percentage of fault is properly attributed" to others. (*Pfeifer*, at pp. 1285-1287; *Rosh v. Cave Imaging Systems, Inc.* (1994) 26 Cal.App.4th 1225, 1234 (*Rosh*); *Estes v. Eaton Corp.* (2020) 51 Cal.App.5th 636, 651.)

The nonparties to whom Ford seeks to attribute fault in this case fall into two broad categories—namely, (1) the entities who might be liable on strict products liability theory (that is, the other automakers who sold vehicles whose used asbestos-containing brake pads plaintiff removed and the manufacturers and suppliers of asbestos-containing brake pads that plaintiff removed from vehicles whose factory-installed brake pads had previously been replaced and that plaintiff installed as replacements), and (2) plaintiff's employers at the gas stations

11

where he replaced brake pads. The sufficiency analysis for each category is different.

### A. *The automakers and the manufacturers and suppliers of asbestos-containing brake pads*

As pertinent to this case, an individual or company is strictly liable for a design defect in its product that injured the plaintiff by causing cancer if (1) "the product . . . failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner," and (2) the product was "a substantial factor in bringing about [the plaintiff's] injury" because "it was," "in reasonable medical probability," "a substantial factor contributing to the plaintiff's . . . *risk* of developing cancer." (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 479; *Rutherford*, *supra*, 16 Cal.4th at pp. 968, 977; see generally CACI No. 1203.)

The jury's finding that Ford is 100 percent at fault for plaintiff's injury is unsupported by substantial evidence because the record compels a contrary finding that "some nonzero percentage of fault is properly attributed" to the automakers and the manufacturers and suppliers of the asbestos-containing brake pads to which plaintiff was also exposed. This contrary finding is compelled by (1) the jury's special verdict finding that Ford's brake pads did not "perform as safely as an ordinary consumer would have expected" and were "a substantial factor in causing" plaintiff's mesothelioma, in combination with (2) several undisputed facts in the record. Because it was undisputed that the brake pads manufactured, supplied, or used by the other automakers, manufacturers, and suppliers had the same composition as the brake pads used by Ford in terms of their asbestos content, the jury's special verdict finding that Ford's

12

brake pads were defective applies with equal force to the brake pads manufactured, supplied, or used by these other entities. Because it was undisputed that plaintiff's exposure to dust from the brake pads used by Ford was a "substantial contributing factor in causing his mesothelioma," because it was undisputed that plaintiff was also exposed to the dust from the brake pads manufactured, supplied, or used by the other automakers and the manufacturers and suppliers, because it was undisputed that every exposure to this dust "add[s] to the [cumulative] dose and increased [plaintiff's] risk" of contracting mesothelioma, and because an exposure that "contribut[es] to [a] plaintiff's . . . *risk* of developing cancer" is a "substantial factor" (*Rutherford, supra,* 16 Cal.4th at p. 977), the jury's special verdict finding that the brake pads used by Ford were a substantial factor contributing to plaintiff's mesothelioma also applies with equal force to the brake pads manufactured, supplied, or used by these other entities. Taken together, this evidence compels a finding that "some nonzero percentage of fault is properly attributed" to the other automakers and the brake pad manufacturers and suppliers. Indeed, plaintiff in his opening statement recognized as much: His counsel noted that plaintiff had been "exposed to other brakes," that "all of the exposures" are what "raise[d] the risk" of mesothelioma, and that, as a result, Ford was not "the only company at fault" and that the "other companies" that manufactured, supplied, or used these other brake pads were also "at fault."

Plaintiff resists this conclusion with a plethora of arguments that boil down to four broad assertions.

First, plaintiff asserts that Ford did not carry its burden of proving that the other automakers and the brake pad

13

manufacturers and suppliers were at fault for his mesothelioma under a strict liability theory. Strict liability, he reminds us, does not equal *absolute* liability. (*Anderson v. Owens-Corning Fiberglas Corp.* (1991) 53 Cal.3d 987, 994.) Because all Ford offered the jury was a "vague impression that [the] other products [were] somewhat similar," because Ford did not put on any independent evidence about the "specific properties" of the brake pads manufactured, supplied, or used by these other entities, about their performance, about plaintiff's extent of usage, or about their effects on him in terms of how they contributed to his contraction of mesothelioma (*Sparks v. Owens-Illinois, Inc.* (1995) 32 Cal.App.4th 461, 478 (*Sparks*)), and because there was evidence that the brakes Ford installed in its new vehicles were *different* because they "occasionally" also contained amosite, plaintiff argues that the jury's finding of fault regarding the brake pads used by Ford does not compel the same finding of fault as to the other automakers and the manufacturers and suppliers of other brake pads plaintiff replaced.

Both the law and the record refute these arguments.

As a threshold matter, the law permits Ford to carry its burden of proving the need for apportionment by relying on evidence introduced by, or elicited from, plaintiff's witnesses. (*Williams v. Barnett* (1955) 135 Cal.App.2d 607, 612 [so holding]; CACI No. 200.) Contrary to what plaintiff and the trial court both suggest, Ford is not required to introduce independent evidence in support of its bid for apportionment.

Further, the record does not support plaintiff's assertion that the evidence gave only a "vague impression" of similarity among the brake pads installed by Ford and the other brake pads plaintiff encountered, or their contribution to his mesothelioma.

14

To the contrary, and as noted above, it was undisputed that the asbestos content of *all* of the brake pads of that vintage was the same; that *all* of the brake pads accordingly generated the same type of asbestos-containing dust plaintiff inhaled; and that each and every one of plaintiff's exposures to this dust was a substantial factor contributing to his development of mesothelioma because *each* exposure to that dust contributed to that development and *none* of those exposures was "insignificant" or capable of being "disregard[ed]" or "discount[ed]."[2] Plaintiff is correct that no medical expert explicitly testified that his exposure to the dust from brake pad jobs on vehicles *other than* Fords with factory-installed brake pads was a "substantial factor" in his contraction of mesothelioma, but there is no "requirement that specific words . . . be recited by [an] expert" (*Hernandez v. Amcord, Inc.* (2013) 215 Cal.App.4th 659, 675) and, due to the identity between *all* of the brake pads of that vintage, the experts' opinions regarding the causal link between plaintiff's

[2] For the first time at oral argument, plaintiff suggested that Ford voluntarily took on a heavier burden with respect to proving causation because it stipulated to a jury instruction that listed seven factors "relevant" to assessing whether "an alleged asbestos exposure" "was a substantial factor" contributing to plaintiff's injury—namely, (1) "the type of asbestos," (2) "the nature of the exposure," (3) "the frequency of the exposure," (4) "the regularity of the exposure," (5) "the duration of the exposure," (6) "the proximity of the asbestos-containing product," and (7) "the type of asbestos-containing product." However, the enumeration of these factors did not modify or otherwise increase Ford's burden of proving causation and, more to the point, it did not negate the undisputed evidence establishing that the asbestos brake pads used, manufactured, or supplied by others were a "substantial factor" contributing to plaintiff's mesothelioma.

15

mesothelioma and the brake pads used by Ford apply with equal force to the brake pads used, manufactured, or supplied by the other entities. Although this link turns in part on the notion that *every* exposure to asbestos dust was a "substantial factor" contributing to plaintiff's risk, that was the notion that formed the very basis for every expert opinion plaintiff offered; plaintiff cannot now disclaim that basis in order to avoid its effect on apportionment. (Cf. *Pfeifer*, *supra*, 220 Cal.App.4th at p. 1288, fn. 1 [no liability where plaintiff did *not* rely upon a theory that every exposure was a substantial factor].)

And the record does not support plaintiff's assertion that the brake pads Ford factory-installed in its vehicles were different or that this difference mattered to this case. Plaintiff's sole support for that assertion is a passage from a July 1968 draft report prepared by an industrial hygiene specialist employed by Ford: "The brake linings in current use may contain 40 to 60 [percent] asbestos when manufactured – the asbestos being normally in the chrysotile form, *and occasionally in the amosite form*." (Italics added.) Plaintiff says that this entire passage refers solely to "Ford brakes"; because other testimony at trial indicated that brake pads of that vintage contained *only* chrysotile, plaintiff continues, Ford's brake pads had a unique composition that render them different from—and, indeed, *more* potent in causing mesothelioma than—the brake pads used by other automakers or manufactured or supplied by other entities. The record does not support the inference plaintiff seeks to draw from the July 1968 draft report. Even if we assume that the report is ambiguous as to whether it refers to brake pads

16

installed solely on Ford vehicles,[3] it is undisputed that Ford used the same brake pads manufactured by others and available to everyone in the automobile industry.  At best, therefore, the July 1968 draft report created a conflict in the evidence regarding whether the brake pads of that vintage contained any amosite, but says nothing about whether the pads used in Ford's vehicles were different than the other pads used at that time.[4]  And even if we were to agree with plaintiff's reading of the July 1968 draft report as establishing that the composition of the brake pads used by Ford was somehow different, it was undisputed that the *dust* generated from the brake pad replacement process contained only chrysotile.  Because mesothelioma was caused by plaintiff's inhalation of that dust, the brake pads used by Ford were indistinguishable from those used by others in the one respect that mattered to plaintiff's lawsuit—namely, their contribution to his mesothelioma.

Second, plaintiff urges that the record does not compel a finding that Ford is not 100 percent at fault because Ford failed to prove the precise percentage of fault that should be apportioned to each of the other automakers and the brake pad

[3]     At a sidebar, Ford's counsel represented that the July 1968 draft report referred to the brake pads installed in Ford vehicles. This is of no consequence to our analysis because (1) counsel's representations to the court at a sidebar is not *evidence*, and (2) we are assuming for the purpose of our analysis that the July 1968 draft report examined only the brake pads factory-installed in Ford's vehicles.

[4]     Indeed, plaintiff's counsel repeatedly represented to the jury during plaintiff's opening statement that the trial would include "no evidence" or "testimony" about plaintiff being exposed "to anything but chrysotile."

manufacturers and suppliers listed on the special verdict form, such that any apportionment by the jury would be wholly speculative.  Plaintiff relies upon language from several cases indicating that a defendant has the "burden to . . . prov[e] . . . the percentage of legal cause attributable to the other companies." (*Sparks*, *supra*, 32 Cal.App.4th at p. 478; *Stewart v. Union Carbide Corp.* (2010) 190 Cal.App.4th 23, 33 (*Stewart*), disapproved on other grounds in *Webb v. Special Electric Co., Inc.* (2016) 63 Cal.4th 167.)

We decline to read this language as requiring a defendant, as a precondition for overturning a verdict apportioning 100 percent of fault against it, to prove the precise percentage of fault attributable to each other entity.  The origin of this language is *Sparks*, but that language was dicta because *Sparks*'s affirmance of the 100 percent apportionment in that case rested on a failure to prove others were at fault *at all* rather than a failure to assign a specific percentage of fault.  (*Sparks*, *supra*, 32 Cal.App.4th at p. 478.)  What is more, the three cases *Sparks* cited in support of its language—namely, *Vermeulen v. Superior Court* (1988) 204 Cal.App.3d 1192, *American Motorcycle Assn. v. Superior Court* (1978) 20 Cal.3d 578, and *Gentry Construction Co. v. Superior Court* (1989) 212 Cal.App.3d 177—do not deal with fixing specific percentages and thus do not lend any support to plaintiff's proffered reading of *Sparks*.

Most importantly, reading *Sparks* to require a defendant to prove up and then assign a specific percentage of fault to each nonparty would render *Sparks* inconsistent with other precedent and with the fundamental purpose of apportionment.  The other precedent obligates a defendant seeking to void a finding of 100 percent fault merely to show "*some*" or "*a*" "nonzero percentage of

18

fault" that is "reasonably" attributable to others rather than a *specific* percentage of fault. (*Pfeifer*, *supra*, 220 Cal.App.4th at pp. 1285, 1286; *Hernandez v. County of Los Angeles* (2014) 226 Cal.App.4th 1599, 1614.) Moreover, requiring a specific and precise percentage of fault would be inconsistent with the very nature of apportionment itself, which is a "flexible, commonsense concept" designed to "arrive at an 'equitable apportionment or allocation of loss.'" (*Knight v. Jewett* (1992) 3 Cal.4th 296, 314; *Rosh*, *supra*, 26 Cal.App.4th at p. 1233; *Pfeifer*, at p. 1285.) If anything, it would be manifestly inequitable—and hence at odds with the function of apportionment—to saddle a defendant with 100 percent of the fault for a plaintiff's injury when the record compels a finding that it was *not* 100 percent at fault merely because it did not assign specific percentages—individually or in the aggregate—to others who are otherwise shown by the evidence to share the fault. This is perhaps why plaintiff, somewhat quixotically, seems to acknowledge that "Ford is correct in noting that" the law does not "require[] evidence . . . as to other entities' precise percentages of fault . . . ."

And contrary to what plaintiff suggests, apportionment is not speculative merely because a party does not prove up a precise percentage of shared fault. The equitable nature of apportionment contemplates that juries will have a fair degree of leeway in apportioning liability without that leeway being invalidated as impermissible speculation. In *Scott v. County of Los Angeles* (1994) 27 Cal.App.4th 125, a child sued the county, her social worker, and her foster mother after the foster mother burned the child by submerging her in scalding water for 30 seconds. (*Id.* at pp. 133, 138.) When the jury apportioned 99 percent of the liability to the county and social worker for failing

19

to supervise the foster mother, but only 1 percent to the foster mother who actually inflicted the harm, the *Scott* court did not hesitate in concluding that the 1 percent apportionment "was improper as a matter of law." (*Id.* at pp. 136, 147.) If apportionment of liability among various tortfeasors in *Scott* was deemed not to be speculative, the apportionment required in this case is certainly not speculative. That is because, under plaintiff's theory and evidence, the risk (and hence injury) to plaintiff was a function of his repeated exposure to asbestos-containing dust, and because it is possible to estimate how often plaintiff worked with brake pads by various automakers, manufacturers, and suppliers and to apportion fault on that basis.

Third, plaintiff contends that Ford effectively forfeited its right to challenge the jury's apportionment because Ford, in its closing argument, made the tactical decision not to "connect the dots" between its observations that Ford was responsible for only a "small percentage" of the "brake dust debris" to which plaintiff was exposed on the one hand, and the jury instructions regarding apportionment on the other hand. This contention lacks merit. Because the argument of counsel is not evidence (e.g., *Beagle v. Vasold* (1966) 65 Cal.2d 166, 181), the absence of *argument* does not equate to an absence of *evidence*, and the latter is all that matters to a substantial evidence challenge. Although a party, in its arguments, may commit itself to one of several alternative theories of liability or affirmatively concede an issue, Ford did no such thing here: The trial court instructed the jury on its duty to apportion liability and Ford argued the facts supporting apportionment; Ford's failure to tie those facts to the apportionment instructions neither committed it to one of several

20

alternative theories nor constituted a concession of the issue.[5] (Cf. *Richmond v. Dart Industries, Inc.* (1987) 196 Cal.App.3d 869, 874-878 [party waived issue by committing to one of several alternative theories in closing argument, but changing theories on appeal].)

Fourth, plaintiff argues that this case is analogous to several other cases—namely, *Sparks*, *supra*, 32 Cal.App.4th 461, *Stewart*, *supra*, 190 Cal.App.4th 23, *Pfeifer*, *supra*, 220 Cal.App.4th 1270, and *Rutherford*, *supra*, 16 Cal.4th 953—where the jury's apportionment of the bulk of fault to the defendant was affirmed as supported by substantial evidence. These cases are not controlling. In *Sparks*, the court upheld the jury's verdict not to apportion any fault to other manufacturers of "asbestos-containing products" because there was no evidence that the plaintiff had been exposed to the asbestos-containing dust from those products. (*Sparks*, at pp. 477-478.) Here, by contrast, it was undisputed that plaintiff was exposed to dust generated by the brake pads of the other entities. In *Stewart* and *Pfeifer*, the courts upheld the jury's verdicts not to apportion any fault, or to apportion significantly less fault, to other manufacturers of asbestos-containing products because the plaintiffs' exposure to the defendants' products were far more extensive and significant

---

[5]    What is more, the jury was instructed—per the parties' agreement—that it could not consider plaintiff's other occupations aboard a military ship and in HVAC and construction work as contributing to plaintiff's exposure to asbestos; this selective determination of which entities were subject to the jury's allocation finding further demonstrates that Ford certainly did not abandon the issue of allocation of fault to the other automakers and the brake pad manufacturers and suppliers.

than to the products of others. (*Stewart*, at pp. 32-33; *Pfeifer*, at pp. 1289-1290.) Here, by contrast, the undisputed expert testimony was that *every* exposure was significant and no exposure could be discounted; further, it is undisputed that plaintiff's work with brake pads in Ford vehicles—and hence his exposure to dust from those pads—constituted at most 8 percent of his work history as a gas station mechanic (that is, at most 16 percent of the *installation half* of a brake replacement). And *Rutherford* dealt with the proper standard for imposing liability upon a party-defendant in the first place, and not the subsequent apportionment of fault vis-a-vis nonparties; indeed, *Rutherford* took pains to distinguish the two analyses. (*Rutherford*, at pp. 958, 983.)

For these reasons, substantial evidence does not support the jury's verdict apportioning no fault to the other automakers and to the manufacturers and suppliers of asbestos-containing brake pads.

### B. *Plaintiff's former employers (the gas stations)*

Any fault of plaintiff's former employers at the gas stations where he worked would be grounded in negligence. Negligence requires proof of a duty of care, breach of that duty, injury to the plaintiff, and a causal link between the breach and that injury. (*Ortega v. Kmart Corp.* (2001) 26 Cal.4th 1200, 1205.)

The jury's finding that plaintiff's former employers are to be apportioned no fault for plaintiff's mesothelioma is supported by substantial evidence because the record does not compel a finding of fault. Here, it was legally undisputed that plaintiff's former employers owed plaintiff a duty of care to "maintain a safe workplace" by "discover[ing] . . . dangerous condition[s]," warning of them, and using "safe practices and procedures," and it was

22

factually undisputed that two of plaintiff's former employers (Standard Oil and Exxon) breached that duty by allowing plaintiff to perform brake replacement jobs without warnings or protective gear despite knowing of the dangers of asbestos-containing dust from blowing out and sanding brake pads. Plaintiff's injury was also undisputed. Yet there was no evidence as to precisely what actions the gas station owners *should* have taken to protect plaintiff and no evidence as to how, if any at all, those actions would have reduced plaintiff's risk of contracting mesothelioma. Maybe they would have, and maybe not. Either way, the record before us does not *compel* a finding of a causal link, and the jury's implicit finding that no such link exists is accordingly supported by substantial evidence.

## III. Instructional Error

Ford argues that it is entitled to a new trial on apportionment vis-à-vis plaintiff's former employers for a second reason—namely, that the jury instructions did not sufficiently inform the jury what it would need to find in order to find those employers at fault.[6] Because plaintiff's former employers did not manufacture or supply asbestos-containing brake pads, any fault on the part of plaintiff's gas station employers would need to be grounded in negligence, as noted above. This presents the question: Did the court's instructions properly instruct the jury on the elements of that theory of liability? We independently

---

[6] Ford also argues the trial court's apportionment instruction was defective because the court used the standard CACI jury instruction (CACI No. 1207B) rather than Ford's special instruction modifying that standard language. Our reversal on substantial evidence grounds moots out the need to reach this issue.

review the correctness of jury instructions. (*People v. Nelson* (2016) 1 Cal.5th 513, 538.)

The jury instructions may well have been erroneous. Although the court instructed the jury that an entity's "negligence" was a basis for apportioning fault, and that an employer had a "non-delegable duty to . . . furnish" its employees "with a safe place to work," the court did not instruct the jury on the elements of negligence generally. The closest the court came was the instruction on negligent product design, but that instruction was couched in terms of product design and was limited to Ford; it is far from clear that a reasonable jury would retrofit these instructions to fit a different type of negligence against an unnamed, nonparty.

But any error was not prejudicial. An error in instructing the jury warrants a new trial only if it is reasonably probable that a proper instruction would have yielded a different verdict. (*Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1072.) Here, it would not have. That is because, as noted above, there was a dearth of evidence regarding the causal link between any negligence by plaintiff's former employers and plaintiff's mesothelioma. Making the elements more explicit would not have cured this gap in the evidence.

## IV. Scope of Retrial

Our conclusion that the jury's verdict apportioning no fault to the other automakers and to the manufacturers and suppliers of brake pads is not supported by substantial evidence means that Ford is entitled to a new trial on the issue of apportionment among Ford and those other entities. But this presents the question: Is Ford entitled to a new trial *on any other issues*?

24

Ford urges that it is entitled to a new trial on *all* issues. We disagree. There is no need to retry the jury's finding of liability against Ford on any of the five theories presented, the jury's finding that Ford engaged in conduct worthy of punitive damages, or the jury's award of $8.5 million in compensatory damages. Each of these findings is supported by substantial evidence, and Ford does not challenge them except to generally complain that they are infected by "passion and prejudice." There is accordingly no reason to disturb them. There is also no merit to Ford's contention that all new trials must encompass *all* issues whenever punitive damages are at issue because, under Civil Code section 3295, the same jury that finds a defendant liable when a case is *tried* must also be the one to impose punitive damages; as the cases cited next indicate, that is not the rule when it comes to what must be *retried*.

Plaintiff urges that we should leave the jury's punitive damages award intact—preferably the original $25.5 million award, but, failing that, even the $8.7 million reduced award. We disagree with plaintiff's suggestion, as well. This is not a case where we are vacating or reducing the compensatory damages award; in such circumstances, courts need not also vacate the punitive damages award if the ratio of punitive to compensatory damages is likely to remain within the constitutionally valid ratio of 10-to-1 or less. (*Izell v. Union Carbide Corp.* (2014) 231 Cal.App.4th 962, 984; *Behr v. Redmond* (2011) 193 Cal.App.4th 517, 536-537; cf. *Auerbach v. Great Western Bank* (1999) 74 Cal.App.4th 1172, 1190 [requiring new trial on punitive damages amount where ratio on remand would be greatly in excess of 10-to-1]; *Frommoethelydo v. Fire Ins. Exch.* (1986) 42 Cal.3d 208, 220 [requiring new trial on punitive damages where "most of the

compensatory damages must be set aside"].)  This makes sense because the defendant's contribution to the plaintiff's injury remains the same as it was before.

Here, by contrast, we are invalidating the jury's apportionment of 100 percent of fault to Ford for—and thus, Ford's contribution to—plaintiff's injury.  Should, as Ford urges, the jury apportion fault in direct proportion to plaintiff's exposure to the brake pads for which it is legally responsible, that jury could apportion Ford at most 8 percent of fault, and possibly less.  This would paint a substantially different picture of Ford's overall culpability, especially vis-à-vis the other entities responsible for exposing plaintiff to asbestos-related brake pads.  Because punitive damages are meant to reflect "the magnitude of [a] defendant's violation" of public policy (*Zhadan v. Downtown L.A. Motors* (1976) 66 Cal.App.3d 481, 496-497), the potential for a jury to find that Ford's violation is of a substantially smaller magnitude counsels in favor of letting the jury on retrial evaluate the opprobrium of Ford's conduct in light of Ford's proportionate fault for plaintiff's injury rather than simply using the constitutional maximum as a back-end safety valve.

## DISPOSITION

The judgment is reversed and remanded for a new trial on the issues of (1) apportionment among Ford, the other automakers, and the manufacturers and suppliers of brake pads, and (2) the amount of punitive damages. The jury's verdict as to Ford's liability, the liability of plaintiff's former employers, Ford's eligibility for punitive damages, and the total amount of compensatory damages is affirmed. Each party is to bear its own costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
HOFFSTADT


We concur:


_____, P. J.
LUI


_____, J.
CHAVEZ